UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VALERIE BEZDEK, individually  )
and on behalf of all others   )
similarly situated,           )
                              )
          Plaintiff,          )    CIVIL ACTION NO.
                              )    12-10513-DPW
                              )
          v.                  )
                              )
VIBRAM USA INC. and VIBRAM    )
FIVEFINGERS LLC,              )
                              )
          Defendants.         )

MEMORANDUM AND ORDER
February 19, 2013

     Plaintiff Valerie Bezdek, on behalf of herself and others

similarly situated, alleges that defendants Vibram USA Inc. and

Vibram FiveFingers LLC ("Vibram") have engaged in deceptive

marketing of their FiveFingers product, a flexible, thin-soled

shoe contoured to the feet and toes.  Before me is defendants'

motion to dismiss, Dkt. No. 15.

**I. BACKGROUND**

***A.    Factual Background***

     Vibram seeks to exploit the wave of popularity in running

barefoot.  Running in defendants' FiveFingers shoes is meant to

mimic barefoot running, while also affording some protection

against the elements.  FiveFingers sell at $80 to $125 per pair,

and sales have grown an average of 300% per year for the past 5

years.

Since defendants began selling FiveFingers in the United States in April 2006, they have repeatedly advertised the "health benefits" attributable to wearing FiveFingers as opposed to other running shoes.  For example, through their website, Facebook page, and in-store displays, defendants advertised that wearing FiveFingers would (1) strengthen muscles in the feet and lower legs, (2) improve range of motion in the ankles, feet, and toes, (3) stimulate neural function important to balance and agility, (4) eliminate heel lift to align the spine and improve posture, and (5) allow the foot and body to move naturally.  At various times, defendants' website added that wearing FiveFingers would improve proprioception and body awareness, reduce lower back pain and injury, and generally improve foot health.  The purported health benefits are well-summarized by Vibram's advertisement that "[w]earing FiveFingers for fitness training, running, or just for fun will make your feet stronger and healthier--naturally."

A brochure included with FiveFingers specifically represented that "[t]he benefits of running barefoot have long been supported by scientific research" and that "[r]unning in FiveFingers enables you to reap the rewards of running barefoot while reducing . . . risks."  Defendants' website included similar representations, and also featured endorsements from doctors as to the health benefits of wearing FiveFingers.  In a news article, Vibram CEO Tony Post commented on the company's

"strong commitment to research and innovation," which was reflected in the "educational section" of the Vibram website.

In reliance on the purported health benefits of wearing FiveFingers, on April 13, 2011, Bezdek purchased the "Vibram Bikilas" model of FiveFingers through defendants' website for $104.90.  Bezdek now claims, however, that defendants' advertising campaign was false and misleading because it misrepresented not only the health benefits of FiveFingers, but also the extent to which such health benefits have been scientifically corroborated.

According to Bezdek, there is no reliable scientific support for defendants' claims as to the health benefits of wearing FiveFingers or barefoot running generally.  The complaint, for example, references a website presenting research, funded in part by Vibram, that states:  "While there are anecdotal reports of barefoot runners being injured less, there is very little scientific evidence to support this hypothesis at this time." The American Podiatric Medical Association ("APMA") took the position in March 2012 that, although "anecdotal evidence and testimonials proliferate on the internet and in the media about the possible health benefits of barefoot running, research has not yet adequately shed light on the immediate and long term effects of this practice."  An April 2012 article in Foot & Ankle International and a May/June 2011 article from the Journal of the APMA similarly report that there is no evidence of decreased

incidence of injuries in barefoot runners, a fact echoed by a variety of other researchers.  The APMA article also called into doubt the ability of barefoot running to improve muscle strength, and indicated that the authors were unaware of any study that evaluated the proprioceptive ability of barefoot runners.

Bezdek says that if she had known there was no scientific evidence supporting the advertised health benefits of wearing FiveFingers, she would not have purchased FiveFingers.  The complaint also alleges that "[r]easonable consumers would not have paid the amounts charged for FiveFingers, or would not have purchased FiveFingers at all, had they known the truth about FiveFingers."  Compl. ¶ 56.

## B.   *Procedural History*

Bezdek filed her initial complaint in this action on March 21, 2012.  Defendants moved to dismiss the complaint, and on June 25, 2012, Bezdek responded by filing the Amended Complaint now challenged by defendants' renewed motion to dismiss.[1]

Bezdek seeks to represent a nationwide class of persons "who purchased FiveFingers running shoes during the period from March 21, 2009 until notice is disseminated to the Class," Compl. ¶ 57, or in the alternative, a similar class of those who purchased FiveFingers running shoes in the State of Florida, Compl. ¶ 58.

---

[1]The prior motion to dismiss, Dkt. No. 10, will be denied as moot.

On behalf of the nationwide class, Bezdek seeks to assert claims for untrue and misleading advertising under Mass. Gen. Laws ch. 266, § 91, for unfair and deceptive practices under Mass. Gen. Laws ch. 93A, §§ 2, 9, and for unjust enrichment.  On behalf of the alternative Florida-based class, Bezdek adds a claim for unfair and deceptive practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.*[2]

On July 18, 2012, Defendants moved to dismiss the Amended Complaint for failure to state a claim.  Dkt. No. 15.

## II. STANDARD OF REVIEW

In order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949, (2009) (citation and internal quotation marks omitted). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Berner* v.

---

[2]Bezdek is not alone in bringing suit against defendants for their allegedly misleading advertising campaign.  *See DeFalco* v. *Vibram USA, LLC*, No. 12-7238 (N.D. Ill. filed Sept. 11, 2012); *Safavi* v. *Vibram USA Inc.*, No. 12-5900 (C.D. Cal. filed July 9, 2012).  Neither is Vibram the only purveyor of barefoot running shoes coming under fire.  *See, e.g.*, *Rocco* v. *Adidas America, Inc.*, No. 12-3015 (E.D.N.Y. filed June 15, 2012).

*Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley* v.
*Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988) (internal
quotation marks omitted).  "[W]here the well-pleaded facts do not
permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged--but it has not
'show[n]'--'that the pleader is entitled to relief.'"  *Maldonado*
v. *Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Iqbal*,
129 S. Ct. at 1949).

I "must accept all well-pleaded facts alleged in the
Complaint as true and draw all reasonable inferences in favor of
the plaintiff."  *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir.
1993).  While I am "generally limited to considering facts and
documents that are part of or incorporated into the complaint," I
"may also consider documents incorporated by reference in the
[complaint], matters of public record, and other matters
susceptible to judicial notice."  *Giragosian* v. *Ryan*, 547 F.3d
59, 65 (1st Cir. 2008) (alteration in original; citation and
internal quotation marks omitted).

### III. ANALYSIS

Defendants argue on various grounds that the complaint fails
to state claim, and also contend that the allegations are
insufficient to maintain a class action.

### A.  *Statutory Claims*

#### 1.  Background

Chapter 93A and the FDUTPA employ similar standards of

-6-

liability.   To prevail on these claims, Bezdek must show that a deceptive act or practice by the defendants caused an injury or loss suffered by her.   *See Casavant* v. *Norwegian Cruise Line, Ltd.*, 919 N.E.2d 165, 169 (Mass. App. Ct. 2009) (93A, § 9 claim required showing "(1) a deceptive act or practice on the part of the [defendant]; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the [defendant's] deceptive act or practice and the consumer's injury"); *Smith* v. *Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1339 (S.D. Fla. 2009) (FDUTPA requires showing "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages").

Mass. Gen. Laws ch. 266, § 91, imposes liability for advertising that contains "any assertion, representation or statement of fact which is untrue, deceptive or misleading, and which such person knew, or might on reasonable investigation have ascertained to be untrue, deceptive or misleading."   The statute does not provide a private right of action, *Thornton* v. *Harvard Univ.*, 2 F. Supp. 2d 89, 95 (D. Mass. 1998), but allows an "aggrieved party" to bring an equitable petition for injunctive relief, as Bezdek does here.   Compl. ¶ 71.

## 2.  Allegations of Falsity/Deception

All of Bezdek's statutory claims require a showing of falsity or deception.   Defendants contend that plaintiff has failed to plead such deception, particularly under the rigorous

standards for pleading fraud under Fed. R. Civ. P. 9(b).  Rule
9(b) provides: "In alleging fraud or mistake, a party must state
with particularity the circumstances constituting fraud or
mistake.  Malice, intent, knowledge, and other conditions of a
person's mind may be alleged generally."[3]

I find the allegations of falsity or deception sufficient.
The complaint specifically identifies several allegedly
misleading statements as to the health benefits of wearing
FiveFingers.  In many instances the complaint provides a specific
date on which these statements were made--for example, when those
statements appeared on defendants' website.  In any event, the
complaint alleges that defendants made similar representations

---

[3]Bezdek cursorily argues that Rule 9(b) should not apply to
her claims under 93A and the FDUTPA.  I need not resolve the
dispute given that I find the allegations sufficient even under
the strictures of Rule 9(b).

I note, however, that the statutory protections against
unfair and deceptive practices extend beyond a common law action
for fraud, which do not - at least under certain state law
standards - necessarily require special pleading specificity.
See U.S. Funding, Inc. of Am. v. Bank of Boston Corp., 551 N.E.2d
922, 925 (Mass. App. Ct. 1990).  That said, the allegations may
nevertheless "sound in fraud" so as to trigger the requirements
of 9(b) when fraud lies at the "core of the action."  Shaw v.
Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996)
(superseded by statute on other grounds).

As to Bezdek's false advertising and chapter 93A claims, she
alleges the "hallmarks of fraud"--namely, willful
misrepresentation or deceit.  Compl. ¶¶ 69, 75; Ed Peters Jewelry
Co., Inc. v. C & J Jewelry Co., 215 F.3d 182, 191 (1st Cir.
2000).  Accordingly, the requirements of Rule 9(b) apply.  By
contrast, because the claim under the FDTUPA does not allege
scienter or reliance, the usual pleading standards under Rule
8(a) apply.  Cf. Shaw, 82, F.3d at 1223.

about FiveFingers' health benefits since they started selling the product in the United States in April 2006. Compl. ¶ 11. That allegation is borne out by the similarity of statements made in March 2007, Compl. ¶ 36, August 2010, Compl. ¶ 30, and March 2012, Compl. ¶ 28.

Bezdek also points to a specific statement on defendants' website as of March 2012 in which defendants represent that the benefits of barefoot running "have long been supported by scientific research," and then advertise that FiveFingers provide "all the health benefits of barefoot running" plus the additional protection of the shoe. Compl. ¶ 33. One can also reasonably infer from the complaint that similar claims made in a brochure included with FiveFingers were made throughout the class period. Compl. ¶ 26. *Cf. Martin* v. *Mead Johnson Nutrition Co.*, No. 09-11609, 2010 WL 3928707, at *4 (D. Mass. Sept. 30, 2010) (accepting inference that otherwise undated advertisements were published during class period).

Bezdek then goes on to allege that there is, as yet, no scientific support for the various representations of health benefits made by defendants, a conclusion shared by various members of the scientific community and trade publications. The complaint thus identifies the statements at issue with adequate specificity, and plausibly alleges that those statements are untrue--or, at least, had a "tendency to deceive." *See Aspinall*

v. *Philip Morris Companies, Inc.*, 813 N.E.2d 476, 487 (Mass. 2004); *accord Fitzpatrick* v. *Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011).[4]

Defendants have no serious argument as to why these allegations are insufficient.  They say that Bezdek truly takes issue with the alleged benefits of barefoot running, not with FiveFingers.  Maybe so.  But, as alleged, defendants chose to incorporate the purported benefits of barefoot running into its advertising campaign.  *E.g.*, Compl. ¶ 33.  Claiming that wearing FiveFingers provides the scientifically-corroborated health benefits of barefoot running is no less deceptive than claiming that the shoes provide some sort of intrinsic health benefit if the claimed benefits do not exist or lack scientific support.

Defendants also argue that the allegations reflect merely a difference in opinion in the scientific community as to barefoot running, and that Vibram has scientific support for its advertising.  Again, this may be so, but resolution of that fact-based argument has no place at the motion to dismiss stage. Defendants also provided warnings about the transition to running

_____

[4] Similar allegations regarding unsubstantiated health benefits claims have been deemed sufficient to state a claim under chapter 93A, *cf. Martin* v. *Mead Johnson Nutrition Co.*, No. 09-11609, 2010 WL 3928707 (D. Mass. Sept. 30, 2010), the FDUTPA, *cf. Smith* v. *Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336 (S.D. Fla. 2009), and consumer protection laws in other states, *cf. Laughlin* v. *Target Corp.*, No. 12-489-JNE/JSM, 2012 WL 3065551 (D. Minn. July 27, 2012); *Rosales* v. *FitFlop USA, LLC*, No. 11-00973, 2012 WL 3224311 (S.D. Cal. Feb. 8, 2012).

in FiveFingers; but such warnings have little bearing on the
alleged deception, given that they do not qualify the notion that
FiveFingers will provide the purported health benefits if used
properly.

Finally, defendants say that more detail is required as to
the particular statements that influenced Bezdek's decision to
purchase FiveFingers, beyond the allegation that she relied on
"the misleading health benefit claims about FiveFingers on
Defendants' website." Compl. ¶ 11. I disagree. As already
discussed, the complaint is replete with the sort of
representations defendants made on their website throughout the
relevant period. Precisely which statement or particular benefit
influenced Bezdek's decision is irrelevant, given that she is not
required to prove actual reliance. *See Iannacchino* v. *Ford
Motor Co.*, 888 N.E.2d 879, 887 n.12 (Mass. 2008); *Moss* v.
*Walgreen Co.*, 765 F. Supp. 2d 1363, 1367 & n.1 (S.D. Fla. 2011).

3. Injury

Defendants next argue that Bezdek has failed to allege an
injury cognizable under chapter 93A and the FDTUPA. *See* Mass.
Gen. Laws ch. 93A, § 9(1) (plaintiff must show she was "injured"
by unfair or deceptive act); Fla. Stat. § 501.211 (plaintiff must
have "suffered a loss").[5] Bezdek does not allege any sort of

---

[5]The parties pay little attention to the injury required
under the false advertising statute. *See* Mass. Gen. Laws ch.
266, § 91 (creating equitable remedy for "aggrieved party"). I

-11-

physical injury from wearing or running in FiveFingers.[6]  Rather,
Bezdek alleges injury in the form of economic loss, resulting
from the fact that she would not have purchased FiveFingers if
she had known the advertised health benefits were untrue, Compl.
¶ 11, or at least that she paid more for the shoes than they were
worth, Compl. ¶ 74.[7]

That Bezdek only bought FiveFingers because of advertised
health benefits, however, explains the way in which defendants'
deceptions may have changed a reasonable consumer's behavior.
This may support causation, *cf. Hershenow* v. *Enter. Rent-A-Car
Co. of Boston, Inc.*, 840 N.E.2d 526, 535 (Mass. 2006) (causation
may be established by showing that "the deceptive advertising

---

will assume that an injury cognizable under chapter 93A is also
cognizable under the false advertising statute.  *Cf. Chenlen* v.
*Philips Electronics N. Am.*, 050525, 2006 WL 696568, at *5 (Mass.
Super. Mar. 1, 2006) (same injury recognized for purposes of both
statutes).

[6]Neither, for that matter, does Bezdek discuss whether she
even used the shoes or received any health benefits from them.

[7]Bezdek also implies that statutory damages might somehow
substitute for an injury in her 93A claim.  Statutory damages
serve no such function.  Rather, chapter 93A's statutory damages
provision "merely eliminates the need to quantify an amount of
actual damages if the plaintiff can establish a cognizable loss
caused by a deceptive act."  *Hershenow*, 840 N.E.2d 526, 533 n.18.
In short, Bezdek confuses the need to prove an injury--even if
the injury is economic loss--with the ability to *quantify* that
loss.  Here, for example, Bezdek must first prove that
defendants' deceptive acts resulted in some sort of "price
premium" for FiveFingers; statutory damages then become relevant
only if she succeeds in doing so, but the premium cannot be
quantified.

'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted'" (modification in original)), but does not tell us whether Bezdek suffered any injury.  True, Bezdek alleges she spent money on shoes she otherwise might not have purchased; but she also received something of value.  If there is injury in the form of economic loss, it is in the difference between the value of FiveFingers either having or not having the represented health benefits.[8]

This so-called "price premium" theory of injury has been the subject of much dispute.  I consider the viability of such a theory under Massachusetts and Florida law.  In doing so, I am keenly aware of my duty, as a federal judge applying state law, to anticipate the manner in which the issue ultimately would be resolved by the respective state supreme courts.  *Moores* v. *Greenberg*, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987).

   *I.  Massachusetts Law*

The First Circuit and I have recently had the opportunity to examine theories of injury under chapter 93A.  *See Rule* v. *Fort Dodge Animal Hosp., Inc.*, 604 F. Supp. 2d 288, 298-306 (D. Mass.

---

[8]Such injury corresponds to the standard measure of damages in cases of deceit--namely, the "benefit of the bargain" rule, whereby "plaintiff is entitled to recover the difference between the value of what he has received and the actual value of what he would have received if the representations had been true."  *Rice* v. *Price*, 164 N.E.2d 891, 894 (Mass. 1960); *accord Kind* v. *Gittman*, 889 So. 2d 87, 90 (Fla. Dist. Ct. App. 2004).

-13-

2009), *aff'd*, 607 F.3d 250, 254-55 (1st Cir. 2010).  I rely on those opinions to provide more extensive background regarding the issues.

For purposes here, it suffices to say that in *Hershenow* v. *Enter. Rent-A-Car Co. Of Boston, Inc.*, 840 N.E.2d 526, 535 (Mass. 2006), the Massachusetts Supreme Judicial Court disavowed the notion that deceptive advertising constitutes *per se* injury on consumers who purchase the product, as earlier cases might have implied, *e.g., Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 402, 813 N.E.2d 476, 492 (2004).  *Hershenow* concluded that car renters, who had purchased collision damage waivers with unlawfully onerous restrictions, could not claim an injury under 93A after their cars were returned without damage and there was no occasion for the restrictions to be enforced against them. *Hershenow*, 840 N.E.2d at 535.

*Rule* v. *Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 253 (1st Cir. 2010), relied primarily upon *Hershenow* in concluding that a buyer of veterinary heartworm-prevention medication with undisclosed health risks could not claim injury after the medication had been administered, the pet remained heartworm-free for the expected period, and the pet emerged unharmed.  Although the plaintiff had purported to rely upon a "price premium" theory of injury, the First Circuit reasoned that plaintiff "neither now could show nor could suffer in the future any adverse economic

-14-

impact," following successful administration of the medication. *Id.* at 253.  As I observed in the decision below, plaintiff "received the full benefit of the bargain she anticipated" when she purchased the medication.  *Rule*, 604 F. Supp. 2d at 304.

The First Circuit noted, however, that Massachusetts might have recognized "price premium" injury if plaintiff had sued *prior* to administering the drug; in that case, she would have held a product worth less than what she paid.  *Rule*, 607 F.3d at 253, 254-55.  The court took its cues from *Iannacchino* v. *Ford Motor Co.*, 888 N.E.2d 879, 882 (Mass. 2008).

In *Iannachino*, plaintiffs alleged that a vehicle manufacturer engaged in an unfair and deceptive practice by selling vehicles it knew did not comply with federal safety regulations.  Although the court ultimately found that plaintiffs failed to allege noncompliance with safety regulations, it first recognized that plaintiffs asserted cognizable "price premium" injury:  plaintiffs' "overpayment" for a noncompliant vehicle constituted an "economic loss" redressable under 93A. *Iannacchino*, 888 N.E.2d at 886-87.  The court distinguished *Hershenow* on the ground that plaintiffs "continue[d] to own the allegedly noncompliant vehicles."  *Id.* at 886; *see also Rule*, 607 F.3d at 255 (price premium injury "follows where the owners still possess their cars, whose value was now reduced because of the [undisclosed risk]"); *Liu* v. *Amerco*, 677 F.3d 489, 495 (1st Cir.

2012) ("plaintiff has alleged that the defendants' attempted
price fixing scheme directly raised the price charged by
[defendant] and paid by [plaintiff]--economic damage by any
test").

It appears that the Supreme Judicial Court is willing to
recognize "price premium" injury by current owners of a product
whose value was artificially inflated by a deceptive act or
practice at the time of purchase.  Although Bezdek does not
specifically allege that she still possesses her pair of
FiveFingers, her proposed class specifically excludes those "who
purchased FiveFingers for the purpose of resale."  Compl. ¶ 57.
I will thus draw the reasonable inference that Bezdek, like the
class she seeks to represent, is a current owner of FiveFingers
shoes.  She has thus asserted cognizable injury under
Massachusetts law.[9]

---

[9]I note that one of my colleagues has taken the position
that current ownership may be unnecessary.  *Martin* v. *Mead
Johnson Nutrition Co.*, No. 09-11609-NMG, 2010 WL 3928707 (D.
Mass. Sept. 30, 2010).  *Martin* held that a conscious choice to
pay more for a product because of a specifically advertised
feature constitutes an injury.  This scenario does seem to
present a legitimate distinction from *Rule*, where the consumer
only bargained for heartworm-prevention and received that
benefit.  In *Martin*, as here, the consumer bargained for an
additional benefit *ex ante*.  And *Hershenow* did not necessarily
rule out that purchase of a deceptively advertised product could
constitute injury, but only rejected the idea that it constitutes
a *per se* injury.  That said, if this is the governing theory, it
is not clear why *Iannachino* relied upon current ownership, given

that the buyers undoubtedly meant to bargain for--and indeed were
entitled to--a safety-compliant vehicle.

I pause to note, however, that the consumers in *Iannachino* were in a very different position from Bezdek.  As *Iannachino* noted, compliance with federal safety regulations was required for the vehicles at issue to get to market, meaning there was no question that "the alleged representation would be causally related to plaintiffs' purchase of the vehicles and therefore to their loss."  *Iannachino*, 888 N.E.2d at 886 n.12.  Moreover, the injury suffered by the consumers in *Iannachino* was easily quantified by the cost of bringing the vehicles into compliance with federal regulations.  *Id.* at 886-87.  Bezdek has no such ready proxies either for the causal connection between defendants' alleged deceptions and the purchase of FiveFingers, or for the influence defendants' representations might have had on the market value of FiveFingers.

     *ii.  Florida Law*

Indications as to the Florida Supreme Court's view of injury cognizable under the FDTUPA are limited, if only barely visible to the human eye.  Other courts, however, have interpreted the FDTUPA "to allow victims of deceptive acts to recover the diminished value of their purchases."  *Coghlan* v. *Wellcraft Marine Corp.*, 240 F.3d 449, 453 (5th Cir. 2001) (citing *Fort Lauderdale Lincoln Mercury, Inc.* v. *Corgnati*, 715 So. 2d 311, 313

(Fla. Dist. Ct. App. 1998))[10]; *Urling* v. *Helms Exterminators, Inc.*, 468 So. 2d 451, 453 (Fla. Dist. Ct. App. 1985).   And in a consumer class action against a yogurt company for its misleading health benefits claims, the Eleventh Circuit, applying Florida law, stated:  "should the class prevail [in showing the yogurt company engaged in conduct capable of deceiving a reasonable consumer], each putative class member would only need to show that he or she paid a premium for [the yogurt] to be entitled to damages under the FDUTPA."  *Fitzpatrick* v. *Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011).

Defendants rely primarily on *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007), where the court rejected plaintiffs' claim of "price premium" injury based on Pfizer's allegedly deceptive advertising that Lipitor lowered the risk of coronary disease.  The theory would require determining the hypothetical price at which Lipitor would sell without the value suggested by misleading advertisements.  According to the court, such a price was too speculative to constitute an injury-in-fact for purposes of Article III.  *Prohias*, 485 F. Supp. 2d at 1336-37.  The court left room, however, for "price premium"

---

[10]The Florida Supreme Court distinguished *Corgnati* for purposes of an insurance dispute, wherein recovery for diminished value depended on the terms of the policy at issue. *Siegle* v. *Progressive Consumers Ins. Co.*, 819 So. 2d 732, 738 (Fla. 2002). However, the court mentioned in dictum that the *Corgnati* court "was construing the language of [the FDUTPA], the damages provisions of which contemplated compensation for diminished value."  *Id.* at 738.

injury when the consumers alleged they would have chosen a substitute product, such that the "premium" could be measured by the difference in price between the chosen product and the substitute.  *Id.* at 1338.  A "substitute goods" theory was unavailable to the plaintiffs in *Prohias*, however, because they had continued to purchase Lipitor even after becoming aware of the alleged deception.  *Id.*

    At this stage in the proceedings I cannot execute the reasoning in *Prohias* that a "price premium" theory of injury is too speculative to be sustained.  Estimations of market value are common in loss calculations, particularly in cases of deceit, including in Florida:

> Generally, the measure of actual damages is the difference
> in market value of the product or service in the
> condition in which it was delivered and its market value in
> the condition in which it should have been delivered . . . .

*Corgnati*, 715 So. 2d at 314.  It may be difficult to determine what market value FiveFingers shoes have without their purported health benefits, or at some stage of consumer doubt regarding their purported health benefits--so difficult, even, that plaintiff may fail to quantify damages.  But this difficulty does not render the controversy nonjusticiable, although it may prove dispositive as a matter of evidentiary sufficiency.

    *Prohias*, in my opinion, is best understood as a case in which plaintiffs had received the benefit of the bargain in their purchase of the drug.  Plaintiffs' continued use of Lipitor

-19-

required the court to conclude that "plaintiffs purchase Lipitor for its cholesterol-reduction benefits or other health benefits, which they have received and continue to receive," rather than for the additional guarantees of coronary health advertised by Pfizer.  *Id.* at 1335.  As in *Rule*, plaintiffs got what they bargained for; neither held a product of diminished value.

Another federal district court in Florida, distinguishing *Prohias*, found cognizable injury where a consumer explicitly pled that the Wrigley chewing gum company had been able to charge a premium for its "Eclipse" gum product over other gum products because it deceptively advertised certain benefits of the "Eclipse" product.  *Smith* v. *Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1340 (S.D. Fla. 2009).  While this may be a useful distinction, I find it unnecessary for Bezdek to have stated a claim.  These considerations go toward quantifying the amount of damages, rather than whether "price premium" is a cognizable injury in the first instance.

Perhaps there is other footwear that might provide a point of price comparison, and that might allow an expert to determine the premium the market would allow for a pair of shoes with exceptional health benefits.  But exactly which alternative footwear Bezdek might have purchased is irrelevant to whether she suffered an injury.  Another Florida federal court put the matter rather simply:

> Ostensibly, a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages.

*Moss* v. *Walgreen Co.*, 765 F. Supp. 2d 1363, 1367 n.1 (S.D. Fla. 2011).

### iii.  Conclusion

I conclude that "price premium" injury is cognizable under the consumer protection laws in both Massachusetts and Florida, and that Bezdek has adequately pled such injury.

### 4.  Scienter

Mass. Gen. Laws ch. 266, § 91, requires that defendants "knew, or might on reasonable investigation have ascertained" that the advertising at issue was untrue, deceptive, or misleading.  Defendants argue that Bezdek has failed to plead this element of scienter by making only conclusory allegations and parroting the language of the statute.

Even under the strictures of Rule 9(b), however, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The allegations must allow nothing more than a "reasonable inference" of scienter. *Cf. Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999) (describing pleading standard for scienter under Rule 9(b) in securities fraud context prior to enactment of "strong

inference of scienter" standard in PSLRA, 15 U.S.C.A. § 78u-4);
*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328 (3d Cir. 2002).

Defendants argue in passing that a higher pleading standard
applies because Mass. Gen. Laws ch. 266, § 91, is a criminal
statute.  The case cited by defendants, however, provides no
support for that proposition, *Martin v. Mead Johnson Nutrition
Co.*, No. 09-11609, 2010 WL 3928710, *15 (D. Mass. Sept. 13, 2010)
(report and recommendation rejected in part on other grounds,
2010 WL 3928707 (D. Mass. Sept. 30, 2010)), and I see no reason
to apply a heightened standard when the statute contemplates a
private equitable remedy sounding in fraud.

*Martin*, in fact, provides a helpful contrast to this case.
The plaintiffs in *Martin* failed to allege the dates of the
advertisements at issue, and included no allegation of complaints
as to the advertising at issue, let alone scientific evidence
that defendants might have known made their advertising
misleading.  *Martin*, 2010 WL 3928707, at *15.

Bezdek's complaint does not suffer such pleading defects.
As already discussed, the timing of the advertisements at issue
is alleged with relative precision.  Moreover, Bezdek points to
research that, if true, renders at least some of Vibram's
advertising deceptive.  Given that some of the research was
funded in part by Vibram, *e.g.*, Compl. ¶ 48, it is reasonable to
infer that Vibram knew or easily could have learned of that

-22-

research.   Statements from the APMA, *e.g.,* Compl. ¶ 4, were also
readily available.   As to the timing of Vibram's knowledge, the
articles cited in the complaint date back as far as June 2009.
Compl. ¶ 49.   But reports that the health benefits of barefoot
running have *never* been scientifically proven could support the
argument that, even as to advertising pre-dating those reports,
Vibram knew the health benefits of FiveFingers were not
scientifically corroborated.

In short, as alleged in the complaint, doubts about the
health benefits of barefoot running--and whether those benefits
have any grounding in science--are no secret.   Vibram, in fact,
actively involved itself in research, making it unlikely the
company was ignorant of the status of scientific knowledge.   To
the extent Vibram nevertheless made misleading statements about
the health benefits of FiveFingers or the scientific support for
those benefits, the complaint allows for the reasonable inference
that Vibram did so knowingly.   Scienter for purposes of Mass.
Gen. Laws ch. 266, § 91, is thus adequately alleged.

## D.   *Unjust Enrichment*

Unjust enrichment is a theory of equitable recovery, whereby
a plaintiff seeks "restitution of a benefit conferred on another
whose retention of the benefit at plaintiff's expense would be
unconscionable." *Smith* v. *Jenkins*, 626 F. Supp. 2d 155, 170 (D.
Mass. 2009).   Recovery under a theory of unjust enrichment is

unavailable, however, if plaintiff has an adequate remedy at law. I conclude Bezdek has such a remedy in this case if she can prove she was damaged by defendants' deceptive practices. *Cf. Hager* v. *Vertrue, Inc.*, No. 09-11245, 2011 WL 4501046, at *7 (D. Mass. Sept. 28, 2011); *One Wheeler Rd. Associates* v. *Foxboro Co.*, 843 F. Supp. 792, 799 (D. Mass. 1994).

True, some courts have allowed claims for unjust enrichment under similar circumstances as a form of pleading in the alternative under Fed. R. Civ. P. 8(d). *Cf. Vieira* v. *First Am. Title Ins. Co.*, 668 F. Supp. 2d 282, 295 (D. Mass. 2009); *Smith* v. *Jenkins*, 626 F. Supp. 2d 155, 170 (D. Mass. 2009); *Brueggemann* v. *NCOA Select, Inc.*, No. 08-80606, 2009 WL 5218024, at *4 (S.D. Fla. Dec. 31, 2009). Bezdek, however, has not only failed to plead that she lacks an adequate remedy at law, but also failed to indicate that the claim for unjust enrichment was made in the alternative, *cf.* Compl. ¶ 81 (specifically indicating that Florida-based class pled in the alternative).

Given the availability of adequate remedies at law for the injury Bezdek asserts, "there is no occasion to invoke equitable remedies" here. *Popponesset Beach Ass'n, Inc.* v. *Marchillo*, 658 N.E.2d 983, 988 (Mass. 1996).

### E.   Class Allegations

Defendants finally argue that Bezdek's class allegations under Fed. R. Civ. P. 23 are insufficient.  Defendants, for

example, take issue with Bezdek's attempt to represent a class of purchasers of FiveFingers "running shoes," arguing that the category of "running shoes" is vague, and styles of FiveFingers may be used for a variety of purposes.  Similarly, defendants argue that Bezdek cannot satisfy the "commonality" or "typicality" requirements of Rule 23, given that members of the proposed class might have purchased various styles of FiveFingers, for any number of different purposes, by several different means, based on any number of representations, and at a variety of prices.

It may well be that variations in exposure to advertising, the advertisements themselves, differences in FiveFingers styles, or the reasons for purchasing FiveFingers will affect the ability to certify a class.  *Cf. Kwaak* v. *Pfizer, Inc.*, 881 N.E.2d 812, 818 (Mass. 2008); *Philip Morris USA Inc.* v. *Hines*, 883 So. 2d 292, 293 (Fla. Dist. Ct. App. 2003); *Markarian* v. *Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60, 68 (D. Mass. 2001).  But that is an issue to be addressed on motions for class certification, following discovery.  *Hines*, for example, turned in part on evidence as to the "substantial number" of people who purchased the product at issue for reasons unrelated to the deceptive advertising.  *Hines*, 883 So.2d at 293.  *Kwaak*, meanwhile, turned on evidence about the development of the advertising at issue over time, and denied class certification only after plaintiffs

were apparently unable to demonstrate common reasons for purchasing the product at issue. *Kwaak*, 881 N.E.2d at 818.

Here too, discovery will shed light on questions like which shoes count as "running shoes," and the characteristics and motivations of buyers of FiveFingers. Until then, dismissing the class allegations would be premature. *Cf. Rosales* v. *FitFlop USA*, 2012 WL 3224311, at *8. Whatever myriad complications may arise, it is sufficient for present purposes that purchasers of FiveFingers seek to determine whether defendants have caused them "price premium" injury because of their deceptive advertising.

Defendants make a parting shot at Bezdek's proposed nationwide class, arguing that application of Massachusetts law to transactions across the country would be "arbitrary or unfair" to the point of being unconstitutional. *Phillips Petroleum Co.* v. *Shutts*, 472 U.S. 797, 821-22 (1985). According to defendants, this action actually implicates the laws of every state in the nation, which would contravene the requirement that questions of fact law and fact common to the class members predominate. I decline to dismiss the class allegations on this ground, however, until more is known about the potential conflict with other laws, an issue on which defendants will likely bear the burden. *Payne* v. *Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 27 (D. Mass. 2003). Choice of law issues may not preclude class certification if no relevant conflicts exist or, to the extent conflicts do exist, if

plaintiffs can be arranged into sub-classes.  *Cf. In re M3 Power Razor Sys. Mktg. & Sales Practice Litig.*, 270 F.R.D. 45, 51 (D. Mass. 2010) (having found "no significant variations in other state laws sufficient to defeat the commonality and predominance," certifying settlement class in multidistrict litigation, where all plaintiffs brought claim under chapter 93A based on deceptive communications originating from defendant's Massachusetts-based headquarters).

## IV. CONCLUSION

For the reasons set forth more fully above, defendants' motion to dismiss (Dkt. No. 15) is GRANTED IN PART and DENIED IN PART.  As discussed at the hearing on this motion, the parties shall file a revised joint scheduling proposal on or before February 28, 2013 designed to govern the development of this case.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE