UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VALERIE BEZDEK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIBRAM USA INC. and VIBRAM FIVEFINGERS LLC,<br><br>Defendants. | Case No. 12-10513-DPW |
| BRIAN DE FALCO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIBRAM USA INC. and VIBRAM FIVEFINGERS LLC,<br><br>Defendants. | Case No. 13-10764-DPW |

**SUPPLEMENTAL DECLARATION OF JANINE L. POLLACK IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

I, JANINE L. POLLACK, declare as follows:

1. I am a partner of the law firm Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"), counsel for Plaintiffs and Lead Class Counsel pursuant to Fed. R. Civ. P. 23(g). I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto. I submit this declaration in further support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Motion") and at the direction of the Court at the Fairness Hearing on October 29,

2014.[1]  Incorporated herein by reference are my two prior declarations dated April 30, 2014 and August 1, 2014, also submitted in support of the Settlement.  These prior declarations also describe the litigation and settlement activities in the case, including the negotiations that led to the Settlement.  This declaration supplements those.

Mediation and Discovery Efforts

2. Following the Court's Initial Scheduling Conference on October 2, 2012, the parties discussed the possibility of a mediation session for a consensual resolution of the case.

3. On January 9, 2013, prior to the Court's ruling on the motion to dismiss, counsel for the parties attended a mediation session with Eric Green of Resolution, LLC in Boston, Massachusetts.[2]  Two executives from Vibram, CEO Mike Gionfriddo and Special Counsel Ric Bertocci, attended.  In advance of that mediation, the parties submitted mediation statements to Mr. Green and Vibram disclosed certain sales data to Plaintiffs.  At the time, Plaintiffs' counsel had advertising exemplars for the products at issue, and had done factual investigation about the relevant scientific issues.  Timothy Blood and I also went into the mediation having recently litigated other functional footwear class action lawsuits against Skechers, Reebok, and FitFlop.  In the FitFlop litigation, Timothy Blood had deposed scientists who specialized in gait mechanics and testing the benefits of functional footwear.  Accordingly, Plaintiffs' Counsel were well-informed about the factual strengths and weaknesses, and potential size, of the class and claims when they participated in formal mediation.  Plaintiffs' Counsel's goal was to obtain a partial refund for class members for their FiveFingers as well as agreement from Vibram to change its advertising that was at issue in the case.  Over the course of the day, Mr. Green attempted to bridge the gap between the parties but they were too far apart and the parties agreed that the second planned day of mediation would not be productive.

---

[1] All capitalized terms have the same meaning as set forth in the Settlement Agreement.

[2] In attendance at the mediation on behalf of Plaintiffs were me, Timothy Blood and William Sweetnam (counsel for Plaintiff De Falco).

4.      Thereafter, on February 20, 2013, the Court issued its ruling granting in part and denying in part Defendants' motion to dismiss.  This Court held that damages were properly alleged, but the potential damages could be limited to a price premium theory that might be difficult or impossible to calculate under the circumstances:  "Bezdek has no such ready proxies either for the causal connection between defendants' alleged deceptions and the purchase of FiveFingers, or for the influence defendants' representations might have had on the market value of FiveFingers." *See* Dkt. 38 at 17.  While Plaintiffs' Counsel believe damages are properly calculable through various methodologies including, for example, Hedonic regression or conjoint analysis, we acknowledge that potential damages under the Court's view are some amount substantially less than the retail price paid.  The Court's order also noted potential hurdles at the class certification stage:  "It may well be that variations in exposure to advertising, the advertisements themselves, differences in FiveFingers styles, or the reasons for purchasing FiveFingers will affect the ability to certify a class." *See id.* at 25.  The order also noted that whether to certify a nationwide class under Massachusetts law would need to be addressed at the class certification stage.  *Id.* at 26-27.

5.      Following transfer of the *De Falco* action from Illinois to this Court on April 3, 2013, and a status conference with the Court on July 2, 2013, Plaintiffs served discovery on Defendants.  *See* Dkt. 72-1 at 5 (discussing written discovery).  On September 11, 2013, Defendants served their responses to Plaintiffs' discovery, including responses to document requests, interrogatories and requests for admission.

6.      With respect to the documents to be produced, the parties engaged in negotiations regarding the scope of this production as well as search terms for the ESI.  Following numerous meet and confer efforts, including through the exchange of emails and telephone conferences regarding the appropriate search methodology for the production of electronic discovery (including the appropriate search terms and custodians), the result was the production of approximately 52,000 pages of documents.  The documents that Defendants produced included, *inter alia*:

- Scientific studies regarding barefoot running;

- Vibram's advertisements and brochures regarding Five Fingers (including packaging inserts and store display models);

- Newspaper articles, magazine articles and internet postings discussing various models of FiveFingers as well as, *inter alia*, Vibram's success in selling FiveFingers;

- Vibram's detailed annual financial statements;

- Sales and marketing agreements between Vibram and vendors of FiveFingers footwear;

- Vibram press releases relating to FiveFingers; and

- Emails and attachments involving, *inter alia*, internal Vibram discussions regarding the marketing and sales of FiveFingers footwear as well as customer comments sent to Vibram through its website.

7. Plaintiffs' Counsel ultimately reviewed all of the documents produced by Defendants. While there were many documents that were potentially useful in advancing Plaintiffs' claims against Vibram there was no "smoking gun" proving Vibram's liability.

8. Vibram also produced, in response to Plaintiffs' interrogatories and document requests, information regarding its sales and expenses relating to FiveFingers shoes. The sales data was consistent with the data that Vibram had supplied to Plaintiffs in advance of the January 2013 formal mediation session.

9. Plaintiffs also issued subpoenas to the following third parties whom they believed to have relevant information: Nail Communications ("Nail"), AMP Agency ("AMP"), and Tomlinson LLC (regarding Five Fingers advertising and marketing) and Dr. Daniel E. Lieberman of Harvard University (a consultant to Vibram). Two of these third parties, Nail and AMP, produced documents prior to the settlement:

- Nail produced an external hard drive appearing to mirror the hard drive of an Apple computer containing, *inter alia*, numerous design documents relating to Vibram's print and online advertising as well as approximately 51,000 pages of emails and associated

attachments. Plaintiffs' Counsel reviewed a sample of these documents through the use of keyword searches focusing on advertising regarding the alleged health benefits of FiveFingers.

- AMP produced 336 pages of documents containing proposed advertising materials and media plans for FiveFingers footwear. Plaintiffs' Counsel reviewed all of these documents.

10. Vibram served document requests on Plaintiffs Bezdek and De Falco.[3] On November 21, 2013, Plaintiffs provided written responses to Vibram's document requests. Plaintiffs Bezdek and De Falco reviewed the list of requested materials and discussed same with counsel so that they could search for responsive discovery. Some of the types of things Vibram requested from Plaintiffs included: their actual FiveFingers shoes; any receipts for FiveFingers; pictures of Plaintiffs wearing FiveFingers; any postings on social media regarding FiveFingers; and the advertising Plaintiffs reviewed regarding FiveFingers. Plaintiffs performed searches for relevant documents and possessions. Plaintiffs' Counsel was preparing to produce all responsive documents and materials to Vibram when the case settled.[4]

11. Aside from the written discovery, given that Plaintiffs' deadline for filing their motion for class certification was January 10, 2014, Plaintiffs also served a Rule 30(b)(6) deposition notice on Defendants for depositions to take place on December 13, 2013 of the person(s) most knowledgeable about the advertising of FiveFingers, including advertising guidelines or programs and training programs established for vendors by Vibram. Similarly, Defendants served deposition notices on Plaintiffs Bezdek

---

[3] In order to avoid duplication of effort and to conserve judicial resources, the parties jointly requested that the court in the *Safavi* action filed in the Central District of California issue a stay until a ruling on class certification in this Court, which that court granted.

[4] In my prior declaration dated April 30, 2014 (*see* Dkt. No. 70-1) at paragraph 13, I inadvertently stated that Plaintiffs "produced documents to Vibram." As I noted at the Fairness Hearing, Plaintiffs did search for responsive information and materials as per Defendants' discovery requests; however, the case settled before Plaintiffs' Counsel was able to produce this discovery to Vibram. Plaintiff Bezdek located a handful of documents and her shoes; Plaintiff De Falco located only his shoes.

and De Falco to take their depositions on December 30, 2013.  Accordingly, Plaintiffs' Counsel was preparing to both take and defend depositions at the time when the case settled.

      Settlement Negotiations

      12.      After the ruling on Defendants' motion to dismiss and the production of discovery by Defendants, Plaintiffs began preparing their motion for class certification.  Given the relevant jurisprudence,  the mediation negotiations and motion to dismiss briefing, Plaintiffs anticipated that Defendants would argue that the class should not be certified because, among other things, (1) a nationwide class was not appropriate under choice of law principles; (2) the proposed class definitions were vague and overbroad; (3) not everyone purchased his or her FiveFingers for running because the shoes have many possible uses; (4) the FiveFingers' advertising touted numerous reasons to purchase FiveFingers beyond those claims challenged in this lawsuit; (5) people may have been unhappy with the health benefits of FiveFingers because they were using the shoes improperly and not following the directions; (6) people may have in fact experienced the benefits claimed by Vibram; (7) the advertising changed over time; (8) each retailer was able to advertise FiveFingers as it wished; (9) certain class members purchased the FiveFingers because of family, friend, or doctor recommendations and not because of the advertising at issue; and (10) Plaintiffs cannot show damages, nor could harm be shown on a class-wide basis without individualized proof for each class member relating to the different retail prices paid by each consumer, and the unique value, if any, each consumer placed on the challenged advertising.  There was a very real risk that the Court would accept one or more of these arguments and refuse to certify the class.  In addition, while Plaintiffs would seek to certify a nationwide class under Massachusetts law, there was a strong possibility that they would only be able to include, at best, Florida, California, and Illinois – the states in which the Plaintiffs had purchased their FiveFingers.  This would have severely limited the size of the class.

      13.      Moreover, even if Plaintiffs were completely successful in their motion for class certification, Plaintiffs would almost certainly have faced a motion for summary judgment in which

Defendants would have argued that Plaintiffs could not bear the burden of proving the falsity or deceptiveness of Defendants' advertising because there are studies demonstrating that barefoot running/FiveFingers strengthen your muscles or result in fewer injuries, the main thrust of Plaintiffs' allegations and, in fact, Defendants had produced in discovery studies which they claimed at least in part supported their representations in their advertising.[5] As such, it would have been a battle of the experts at trial and there is no guarantee that the trier of fact would have found in favor of Plaintiffs.

14. Proving damages also had significant risks for Plaintiffs. Under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), at the class certification stage, Plaintiffs would have been required to demonstrate a viable damages theory and classwide methodology for calculating damages. *Id.* at 1432-33. For example, under a price premium theory, they would have had to isolate the value of the challenged benefits or prove the premium they paid for the misrepresented attributes in question. While there are various potential methods to prove damages, one challenge in particular would likely have been that Defendants would have argued there is no obvious comparator in the market given the uniqueness of the FiveFingers shoes and it would have therefore been difficult to quantify the price premium paid. Moreover, there is no way to know how much the trier of fact would have found to be the premium given all the various attributes of these shoes. For most of the FiveFingers models, the FiveFingers' advertising, labeling and website lists many possible uses for the shoes besides running, including weight lifting, boating, yoga, walking, and others. Again, this would have made a damages calculation under the price premium theory more challenging and the jury could have determined that the value of the challenged advertising was only a small percentage of the price of the shoes. This is also true if an expert

---

[5] Vibram produced a number of scientific papers to Plaintiffs which purported to support Vibram's claims about FiveFingers' health benefits including *Foot strike patterns and collision forces in habitually barefoot versus shod runners*, Lieberman, Daniel E., *et. al.*, Nature 463, 531-535 (28 January 2010) (available at http://www.nature.com/nature/journal/v463/n7280/full/nature08723.html); *Biomechanical analysis of the stance phase during barefoot and shod running*, De Wit, Brigit, *et. al.*, Journal of Biomechanics, 33(3): 269-78 (Mar. 2000) (abstract available at http://www.ncbi.nlm.nih.gov/pubmed/10673110).

were to conduct the complex Hedonic regression or other relevant analysis. These were substantial risks that Plaintiffs weighed in deciding to settle the case prior to class certification and trial. Settling now for a sum certain avoided the risk that the jury would find even less or no damages at trial and also ensured that the entire country could participate.

The Media and the Settlement

15. In any settlement where the names of the class members are for the most part unknown and notice will be largely by publication, the challenge is to determine how to reach the most people in the relevant population in a cost-effective way. Spending the Settlement Fund on a notice program that has diminishing returns beyond a certain point is wasteful of the class' money. Here, Heffler Media LLC, a highly experienced class action administrator, designed a notice program that was cost effective and which reached potential class members through various media, including through online banner advertisements that had more than 300 million "impressions," or opportunities to see the banner advertisement online. *See* August 4, 2014 Declaration of James R. Prutsman (Dkt. No. 83-2-8), at ¶ 7. However, as noted in the October 15, 2014 Declaration of James R. Prutsman (Dkt. No. 95), what Plaintiffs did not expect was the free media exposure that this Settlement generated. *Id.* at ¶¶ 10-12. For example, on May 9, 2014, the Today Show aired a news story on the Settlement that was viewed by over 4 million people. *Id.* at ¶ 11. The story was also made available as a link on the NBC News website. *Id.*[6] Thereafter, other news outlets aired similar stories. *Id.* at ¶ 12. It is unusual for non-Government consumer settlements, particularly of a niche product such as FiveFingers, to garner so much attention in the news. Such stories tend to be more credible and visible than the class notice.

16. The Settlement also "went viral" on social media. As an example, and as detailed in the October 15, 2014 Prutsman Declaration, over 31,000 "tweets" on Twitter were created regarding the Settlement, which ultimately reached 43.6 million Twitter accounts. *Id.* at ¶ 13.

---

[6] Available at http://www.nbcnews.com/business/consumer/vibram-fivefinger-shoes-give-refunds-over-allegedly-bare-health-claims-n101301.

17.     Given the surprising news outlet and social media (free) attention, coupled with the direct email and postcard notice Plaintiffs' Counsel were able to effect, the reaction to the Settlement was larger than expected.  As with any settlement, it is impossible to predict with precision how class members will react or how many will actually submit claims.  In this instance, because Plaintiffs' Counsel wanted to encourage participation, a one-page simple claim form was used and no proof of purchase was required for up to two pairs.  Ultimately, based on the full number of claims, approximately 67% submitted claims for two pairs and another 3% submitted claims for three or more pairs (with a receipt).  *See* Declaration of James R. Prutsman In Response to Court's Request ("Prutsman Supp. Decl.," filed concurrently with this declaration) at ¶ 6.  28% of claimants submitted claims for one pair.  *See id,* at Ex. A.  Given these statistics, if the Settlement is approved, approximately 70% of class members will receive a check for two or more pairs.  *See id.*

18.     But all of these facts that are now known were unknown when the Settlement was signed.  A larger than expected claim rate, usually the hallmark of a good settlement, does not change what the risks were during negotiations that were carefully evaluated by Plaintiffs' Counsel based on the existing case law, the documents produced in discovery, previous experience in similar false advertising class actions, and the likelihood of success through class certification and trial.

19.     The negotiations that led to the Settlement were hard fought, beginning with the failed mediation in January 2013 and again later over the course of two months in November and December 2013.  As stated in the Morrison Decl., Defendants believed that Plaintiffs would have difficulties in certifying the case as a class action.  *See* Morrison Declaration at ¶ 46.  For this reason, the Parties saw a small window of opportunity to discuss a consensual resolution of the case before the class motion.  Moreover, given that sales to retailers were declining and retailers had begun to discount the product, sometimes substantially (*see id.,* ¶ 27), Defendants had to take this into account in coming to a number to settle the case.  While any plaintiff's counsel always wants a larger cash value in a settlement, ultimately, given the risks of continued litigation, especially the imminent class certification motion, Plaintiffs'

Counsel here determined that a sum certain now, discounted for those risks, was an excellent settlement for the class. Moreover, Plaintiffs' Counsel's objectives at trial would have been a combination of injunctive relief and a partial refund and that is precisely what was achieved through this Settlement.

20.     The estimated refund to the Class of approximately $8.44 per pair (*see* Prutsman Supp. Decl., at ¶ 16) is 9.0% of the average suggested manufacturer's retail price ("MSRP") of $94.00 (*see* Morrison Decl., at ¶ 50) for the shoes, however, many class members paid less than the MSRP. As stated in the Prutsman Supplemental Declaration, based upon a random sample of 100 of the claims with receipts (for some 340 pairs) received by Heffler from Class Members, the average price per pair based on such receipts was $77.89. *See* Prutsman Supp. Decl., at ¶ 11. Based on this anecdotal information, the expected refund of approximately $8.44 would represent an estimated 10.8% recovery of the average price paid. There is no guarantee that Plaintiffs could have achieved a better result at trial under the price premium theory or any other reasonable damages theory after accounting for the time value of money, trial expenses, attorneys' fees and other risks, assuming that the case proceeded to trial on a class basis.

21.     In any settlement where the claims are adjusted pro rata, there is always a chance that fewer people will get a larger refund or more people will get a smaller refund and this is purely a function of how many people submit claims and for what number of items. The outcome cannot be known at the start. With the unknown of the media attention, we settled the case based on good faith estimates and hard-fought negotiations. Altogether with the risks entailed, achieving a settlement that will provide significant injunctive relief and cash to claimants who purchased FiveFingers during the Class Period is an eminently fair, reasonable and adequate resolution.

22.     The costs for Claims Administration in this case are also eminently reasonable. The Class Action Settlement Administrator's declaration sets forth the line item costs of administration. *See* Prutsman Supp. Decl., at Ex. B  As the table demonstrates, Heffler has given the class a discount for the administration costs. *See id.* Even with the larger than expected claim rate, the class will only be charged $483,955.11 for the entire Notice and Claims Administration, which is fair and reasonable. *See id.* at ¶13.

23.     As stated in my prior declaration dated August 4, 2014 (Dkt. No. 83-1), at the time of the submission of the Joint Motion for Final Approval of the Settlement, Plaintiffs' Counsel had spent a total of 2,262.1 hours with a lodestar of $1,243,539.75. *See id.* at ¶ 8. The requested fee of 25% of the settlement fund ($937,500) therefore represented a fractional multiplier of approximately 0.75 of Plaintiffs' Counsel's lodestar amount. *See* Plaintiffs' Memorandum in Support of Motion for Final Approval of Class Action Settlement (Dkt. No. 83), at 32. At the Fairness Hearing, the Court requested that Plaintiffs' Counsel submit an updated time report through that date. Plaintiffs' Counsel's time and lodestar up through the Fairness Hearing are as follows: 2,492.25 hours and $ 1,369,393.25, which reflect an additional 230.15 hours and $125,853.50 in lodestar time spent on the case since the motion for final approval through and including the date of the Fairness Hearing. Most of those hours were spent responding to the objections in the supplemental memorandum of law and on communicating with the Class Action Settlement Administrator regarding the claims submitted. As of the Fairness Hearing, the requested fee of 25% of the settlement fund represents a fractional multiplier of .68 of Plaintiffs' Counsel's lodestar.

24.     The total expenses requested by Plaintiffs' Counsel in their motion for final approval were $62,133.68, which was less than the $70,000 maximum amount stated in the Notice. This requested amount included an estimated $1,200.00 for the cost of Lead Class Counsel's travel, lodging and meals for attendance at the October 29, 2014 Fairness Hearing before the Court. Dkt. No. 81-1 at 4 n.3. The actual expenses amounted to $740.76.[7] Accordingly, the amount of expenses Plaintiffs seek from the Settlement Fund is now $61,674.44.

25.     In sum, Plaintiffs' Counsel, in their reasoned judgment, determined that given the risks of class certification, summary adjudication and trial, it made sense to settle the case on the terms presented in this settlement. The settlement negotiations were hard-fought between very experienced counsel who

---

[7] Those travel expenses for Janine Pollack and Michael Liskow were as follows: $519.72 for hotel, $133.25 for transportation and $87.79 for meals.

have successfully concluded dozens of other consumer settlements and were more than competent to evaluate the discovery and risks of the case.  The settlement gives partial refunds to a nationwide class spanning some six years, perhaps in at least an amount that could have been expected to be achieved at trial; injunctive relief requiring Defendants to not make the disputed claims about FiveFingers or any other similar shoes in the future unless such representation is true, non-misleading and is supported by competent and reliable scientific evidence; and avoided the risks, uncertainties and cost of continuing litigation for a cash payment now.  The sheer number of people participating in the settlement suggests it was well received by the class and some 70% will receive refunds for 2 or more pairs.  All of the hallmarks of a fair, reasonable and adequate settlement are present here and for the foregoing reasons, and those stated in Plaintiffs' Counsel's prior submission and presentations to the Court, Plaintiffs' Counsel respectfully submit that the settlement should be approved.

Signed under the pains and penalties of perjury this 12th day of November, 2014.

>               /s/ *Janine L. Pollack*
>               Janine L. Pollack

**CERTIFICATE OF SERVICE**

I, Nathaniel L. Orenstein, hereby certify that on October 12, 2014 I caused a copy of the foregoing document to be filed electronically via the Court's electronic filing system. Those attorneys who have appeared or made arrangements to appear are registered with the Court's electronic filing system and may access this filing through the Court's system. Notice of this filing will be sent to these parties by operation of the Court's electronic filing system.

          /s/ *Nathaniel L. Orenstein*
          Nathaniel L. Orenstein