UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


VALERIE BEZDEK, individually )
and on behalf of all others )
similarly situated, )
)
             Plaintiff, )   CIVIL ACTION NO.
)   12-10513-DPW
)
)
       v. )
)
VIBRAM USA INC. and VIBRAM )
FIVEFINGERS LLC, )
)
          Defendants. )
)
_____)
BRIAN DEFALCO, individually )
and on behalf of all others )
similarly situated, )
)
             Plaintiff, )   CIVIL ACTION NO.
)   13-10764-DPW
       v. )
)
VIBRAM USA INC. and VIBRAM )
FIVEFINGERS LLC, )
)
         Defendants. )


## MEMORANDUM AND ORDER
January 16, 2015

Before me, following a fairness hearing and the submission

of various post-hearing materials as I directed, is a proposed

settlement agreement between the defendants, Vibram USA Inc. and

Vibram FiveFingers LLC (collectively, "Vibram"), both

1

Massachusetts residents, and a nationwide class of consumers who purchased FiveFingers "barefoot" footwear directly from the defendants or through authorized retailers between March 21, 2008, and May 27, 2014. The plaintiffs in these consolidated actions allege that the defendants misrepresented in their advertising and marketing that this footwear provides certain health benefits to wearers.

The plaintiffs have moved for approval of the proposed settlement agreement, which would establish a $3,750,000 non-reversionary settlement fund to provide refunds to eligible class members and cover the costs associated with this litigation, including administrative costs, attorneys' fees and expenses, and incentive awards for the named plaintiffs. The agreement also provides that Vibram will refrain from making representations of health benefits associated with FiveFingers unless it has reliable evidence to support those representations.

In connection with settlement approval, class counsel for the plaintiffs seek $937,500 in attorneys' fees, $61,674.44 in expenses,[1] and $6,500 in plaintiffs' incentive awards, allocating

---

[1] Class counsel initially requested $62,133.68, anticipating certain expenses related to attending the fairness hearing.

$2,500 each to Valerie Bezdek and Brian DeFalco, the named plaintiffs here, and $1,500 to Ali Safavi, the plaintiff in a parallel proceeding in the Central District of California, who has agreed to file a joint stipulation to dismissal of that action with prejudice if this settlement is approved. All of these fees and awards would be paid out of the settlement fund. Three objectors raised a variety of concerns about the proposal, contending among other things that the notice to the class and the monetary and injunctive relief provided by the agreement are inadequate, that the requested attorneys' fees are excessive, and that incentive awards and a cy pres provision[2] are inappropriate.

This memorandum sets forth in detail my reasons for finding that the proposed settlement agreement is fair, reasonable and adequate as required by Fed. R. Civ. P. 23(e). Accordingly, I will approve the class with finality and also approve the settlement agreement involving the class, Dkt. No. 80. I

---

Because the actual expenses incurred were slightly lower, counsel has decreased its request.

[2] The cy pres provision proved to be moot, however, because the settlement fund will be completely exhausted and consequently no cy pres award will be made. *See* note 5, *infra.*

further award the attorneys' fees, expenses, and incentive awards requested.

## I.  BACKGROUND

### A.  *Procedural History*

#### 1.  Underlying Actions

In mid-2012, plaintiffs in three states filed putative class action complaints alleging that the defendants engaged in deceptive marketing of FiveFingers footwear by advertising through in-store and online mechanisms, as well as through product packaging, that wearing FiveFingers provides certain "health benefits," including muscle strengthening and more natural movement and alignment, and representing that these health benefits are supported by scientific research.[3]  The underlying complaints in these actions contended that the assertions of health benefits and scientific support for such benefits are false and misleading.

---

[3] Specifically, the defendants have represented that wearing FiveFingers will (1) strengthen muscles in the feet and lower legs, (2) improve range of motion in the ankles, feet, and toes, (3) stimulate neural function important to balance and agility, (4) eliminate heel lift to align the spine and improve posture, and (5) allow the foot and body to move naturally.  One marketing document, for example, attests that "[w]earing FiveFingers for fitness training, running, or just for fun will make your feet stronger and healthier—naturally."

On March 21, 2012, Bezdek filed the first of the complaints in this court on behalf of a proposed nationwide class, alleging violations of Mass. Gen. Laws ch. 266, § 91 (untrue and misleading advertising), Mass. Gen. Laws ch. 93A, §§ 2, 9 (unfair and deceptive practices), and Florida Statutes § 501.201 *et seq.* (on behalf of an alternative Florida-based class), as well as unjust enrichment. Bezdek purchased a pair of FiveFingers footwear in April 2011 for $104.90 through the defendants' website, purportedly relying on the representations of health benefits associated with the footwear. She claims that if she, and other reasonable consumers, had known there was no scientific evidence supporting those benefits, she would not have purchased the footwear, and that she has suffered an economic loss attributable to the defendants' conduct.

The defendants moved to dismiss Bezdek's complaint, and on June 25, 2012, Bezdek responded by filing an amended complaint, which the defendants challenged through a renewed motion to dismiss. On February 20, 2013, I denied the initial motion to dismiss as moot, and denied in part the renewed motion to dismiss, finding that Bezdek adequately alleged falsity or deception, a cognizable "price premium" injury under the applicable consumer protection laws, and scienter. *Bezdek* v.

*Vibram USA Inc.*, Civ. No. 12-10513-DPW, 2013 WL 639145, at *3-4, *8-9 (D. Mass. Feb. 20, 2013). I allowed the renewed motion to dismiss on the unjust enrichment claim, because I concluded that the plaintiff had an adequate available remedy at law. *Id.* at *9.

The second relevant complaint was filed on July 9, 2012 in the United States District Court for the Central District of California by Safavi, represented by the same counsel as Bezdek. *See Safavi* v. *Vibram USA Inc.*, No. 12-cv-05900-BRO-JCG (C.D. Cal.) (Compl., July 9, 2012, ECF No. 1). Safavi purchased a pair of FiveFingers footwear in July 2011 from an REI store in California for $92.96, also purportedly relying on the representations of health benefits associated with the footwear. *Id.* ¶ 11. On behalf of a proposed class of California consumers, Safavi alleges violations of the California Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, the California Consumers Legal Remedies Act, Civil Code § 1750 *et seq.*, and breach of express warranty. *Id.* ¶¶ 66-92. On September 24, 2012, the *Safavi* action was stayed pending a ruling on class certification in the *Bezdek* action. *Safavi*, No. 12-cv-05900-BRO-JCG (Order, Sept. 24, 2012, ECF No. 24). If the settlement is approved, Safavi and the defendants agree to file

a stipulation of dismissal of that action in the Central District of California.

The third relevant complaint was filed on August 13, 2012 in Illinois state court by DeFalco. *See DeFalco* v. *Vibram USA, LLC*, No. 12-cv-07238, 2013 WL 1122825, at *2 (N.D. Ill. Mar. 18, 2013). DeFalco purchased three pairs of FiveFingers footwear in or about December 2011 and April 2012 from a FiveFingers authorized retailer in Illinois, for prices of approximately $130 and $110. *Id.* at *1. On behalf of a proposed class of Illinois consumers, DeFalco alleges violations of the Illinois Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*, breach of express warranty, and unjust enrichment. *Id.* at *6. The *DeFalco* action was removed to the United States District Court for the Northern District of Illinois on September 11, 2012. *Id.* at *2. On March 18, 2013, the defendants' motion to dismiss was granted in part and denied in part, and its motion for transfer to this district was granted. *Id.* at *12.

I stayed the *Bezdek* matter from March to May 2013 to allow for the transfer of the *DeFalco* matter from the Northern District of Illinois, and for the disposition of the motion to transfer the *Safavi* matter from the Central District of

California.  The *Safavi* matter was ultimately stayed rather than transferred.  Following the transfer of the *DeFalco* matter in April 2013, I consolidated it with the *Bezdek* action.

### 2. Discovery and Settlement Negotiations

In July 2013, I set deadlines for discovery and motions for certification of the class in the now consolidated *Bezdek*/*DeFalco* actions, anticipating that fact discovery would be completed by April 21, 2014.  Counsel represent that over the course of the summer and fall of 2012, the parties engaged in extensive written discovery efforts, through written requests made by each party of the other, and through third-party document subpoenas.

Although mediation efforts in January 2013 failed, sometime in the fall of 2013 the parties resumed settlement negotiations and reached an agreement in principle on December 12, 2013.  On December 20, 2013, the parties jointly requested a stay of the proceedings, which I granted, and anticipated finalizing a settlement agreement in early 2014.  At that time, the plaintiffs had not filed a motion for class certification or identified an expert on class issues, nor had either party taken any depositions.

## 3.  Proposed Settlement and Preliminary Review

On April 30, 2014, the parties submitted a proposed settlement agreement which was shortly thereafter replaced by a joint amended settlement agreement.  The plaintiffs thereafter moved for preliminary review, authorization of class notice, and scheduling of a final fairness hearing.

Following a hearing, on May 12, 2014,[4] I granted the plaintiffs' motion and issued an order, Dkt. No. 76 ("order authorizing notice"), certifying pursuant to Fed. R. Civ. P. 23, a class for the purposes of settlement only; appointing Bezdek as the class representative, and her counsel, Wolf Hadenstein Adler Freeman and Herz LLP, as lead class counsel for the class; approving notice as set forth in attachments to the amended settlement agreement; appointing Heffler Claims Group LLC as the notice and settlement administrator; approving the claim form provided as an attachment to the amended settlement agreement; and scheduling a fairness hearing.

I then approved deadlines that would govern the class notice and periods for submitting claims, opt-outs, and objections.  On August 1, 2014, the plaintiffs filed a motion

---

[4] That same day, the parties submitted a joint second amended settlement agreement, Dkt. No. 77, which I consider to be the proposed settlement for the purposes of my review here.

for final approval of the proposed settlement agreement and award of attorneys' fees, out-of-pocket expenses, and incentive awards for the named plaintiffs. I held a fairness hearing on October 29, 2014, as a result of which I directed further submissions.

**B.  *The Proposed Settlement Agreement***

  1.  Key Settlement Terms

The agreement creates a non-reversionary settlement fund of $3,750,000, out of which will be paid the administrative costs (covering notice and claim processing expenses, and fees for the notice and settlement administrator's services); attorneys' fees and expenses; incentive awards for the plaintiffs; necessary taxes and fees; and finally payments to class members who submit valid and timely claims.[5]

The class that stands to benefit from the agreement, briefly defined and discussed in greater detail below, includes

---

[5] The agreement provides that if the expenses and claims do not exhaust the settlement fund, a cy pres beneficiary would be designated to receive the residual funds. After all fees, awards, and claims have been paid, the settlement administrator would distribute any residual funds "to the American Heart Association with specific earmark relating to research regarding health benefits associated with running or exercise or substantially similar research, or such other beneficiary as the Parties and the Court shall agree." The parties have informed me that the fund will be exhausted from the claims, and therefore that this provision is moot. *See* note 2, *supra*.

all individuals who purchased certain FiveFingers footwear in the United States from Vibram and/or its authorized retailers between "March 21, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier," which has since been defined as May 27, 2014.

Class members may request a refund for each pair of eligible FiveFingers footwear purchased during the class period.[6] Refunds will be paid on a pro rata basis from the settlement fund, after the payment of other costs and expenses. Refunds are capped at $94.00 per pair, which is said to represent the average manufacturer's suggested retail price of a pair of FiveFingers footwear. Although the agreement asserts that, based on similar settlements, "it is reasonable to expect that Class Members may receive payment in the range of $20.00 to $50.00 per pair," it does not specify a minimum floor for recovery. To obtain a refund, class members must have submitted a valid claim form during the claim period, which began in May, 2014, and ended on September 24, 2014.

---

[6] Although there is no limit on the number of pairs for which a class member may seek a refund, a refund request for more than two pairs of footwear requires proof of purchase. Otherwise, proof of purchase is not necessary unless requested by the settlement administrator.

The agreement also provides for injunctive relief in the form of restrictions on Vibram's advertising and marketing campaigns for its FiveFingers footwear. Specifically, Vibram agrees "to take commercially reasonable efforts to discontinue certain aspects of its advertising and marketing campaign," including not making, or assisting others in making, claims that the footwear is "effective in strengthening muscles or preventing injury," or provides any health benefit, unless such claims are based on competent and reliable scientific evidence and are true and non-misleading. Vibram also agrees to refrain from misrepresenting, and assisting others in misrepresenting, "the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research relating to Vibram's FiveFingers footwear or products similar to the Fivefingers footwear."

## 2. Notice

Notice was distributed to the class pursuant to my order of authorization between May 27 and July 28, 2014. The plan provided for direct notice to individuals where practicable through e-mail and postal mail, as well as summary notice through publication in newspapers, magazines, and other media outlets; publication of banner advertisements on various

informational and social media websites; and maintenance of a settlement website and toll-free telephone number providing information to class members.

On May 12, 2014, the notice administrator established a website, www.fivefingerssettlement.com, to inform class members about the settlement. As of September 24, 2014, the claim filing deadline, more than 321,000 new first-time users had visited the site, with over 465,000 sessions. Twenty percent of this Internet traffic originated from RunnersWorld.com and its mobile counterpart, and the rest from social media and news websites.

The direct notice program was substantially completed by July 8, 2014. E-mail notice was delivered successfully (that is, not returned as bounced or undeliverable) to 195,674 unique e-mail addresses of people who had purchased Vibram products. Postcard notice was sent successfully to 64,962 addresses of unique class members.

The notice administrator published the summary settlement notice in the August 2014 print and online versions of the national magazine, *Runner's World*, which has "an estimated print circulation of approximately 673,000 and readership of 2.86 million." Banner advertisements ran for four weeks in June 2014

on Facebook (targeting class members' demographics) and RunnersWorld.com, as well as through several networks, including Gannet, which has over 100 newspaper and television websites; the Time Access Network, whose portfolio includes "People.com, Health.com, Time.com, SportsIllustrated.com, CNNMoney.com, and others"; and the Xacis Network, which includes FitnessHealthZone.com and Active.com. Banner advertisements also ran "on a mobile network with close to 50,000 apps across all mobile and tablet platforms" including "sites that were targeted towards Adults 25-54 who run, walk, or participate in other fitness activity, including among others NYT Health and Fitness, Everyday Health, and ESPN News." These banner advertisements on online and mobile platforms generated "more than 300 million impressions, or opportunities to see the ad," consistent with the threshold required by the order authorizing notice.

In addition to this intentional distribution of notice, the notice administrator observed more than 900 online news mentions, including 124 blog posts, and continued coverage on local, regional, national, and international media outlets through the claims deadline, which the administrator and class

counsel have characterized as unusual unsolicited attention for a class action settlement of this nature.

### 3. Claims, Opt-Outs, and Objectors

The settlement administrator received 154,927 timely claims, representing 279,570 pairs of FiveFingers footwear, prior to the closing of the claim period on September 24, 2014. Of these claims, approximately 28% were for one pair, 67% were for two pairs, and 3% were for three or more pairs. The administrator anticipates that 4-5% of these claims will be rejected as invalid, leaving approximately 268,570 pairs for which the fund will provide a refund.[7]

Written opt-out requests, objections, and notices of appearance at the fairness hearing were to be submitted by August 15, 2014. Prior to this deadline, the notice administrator received a total of 23 opt-out requests. In addition, three individuals filed objections to the settlement: Madeline Monti Cain, Justin Ference, and Michael Narkin. The plaintiffs ask that I simply overrule these objections — rather than considering the challenges they raise to the proposed

---

[7] This "defect rate" is said to be lower than a typical 10% defect rate because claimants were not required to provide receipts for claims of one or two pairs of footwear. The total claim rate was apparently higher than anticipated. This may be attributable to the unusual level of media attention to the settlement.

settlement — on three grounds: first, because the objectors each have an improper purpose for pursuing his or her objection; second, because none has complied with the requirement in the agreement and communicated in the notice that proof of purchase must be submitted with an objection to establish membership in the class;[8] and finally because the claims they advance are unmeritorious.

It is my role "to distinguish between the meritorious objections and those advanced for improper purposes." Manual for Complex Litigation (Fourth) § 21.643. I am persuaded there are genuine questions as to the status of the objectors as class members. Nonetheless, I have considered the merits of the objectors' assertions to the extent they raise questions that I would ask independently in my own review of the proposed settlement.[9]

---

[8] The plaintiffs note that only one of the three objectors, Ference, even submitted a claim form.

[9] After the objections were filed, the plaintiffs moved for leave to conduct limited discovery of the objectors, apparently in order to provide further support for their assertions that these objectors are not class members and do not advance claims in good faith. Objector Cain filed a response to this motion requesting that it be denied as to her, because she had been cooperating with the plaintiffs' requests for discovery and deposition prior to the filing of the motion. Even without express leave to conduct discovery, the plaintiffs unearthed and presented meaningful information challenging the objectors' standing. Regardless, because I will approve the proposed

## II. PRELIMINARY MATTERS

### A. *Adequacy of Notice*

Settlement approval requires confirmation that notice was conducted in a reasonable manner, consistent with Fed. R. Civ. P. 23 and due process concerns. Notice of a class action settlement must be "reasonably calculated to reach the absent class members." *Reppert* v. *Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004) (quoting *Hallman* v. *Pennsylvania Life Ins. Co.*, 536 F. Supp. 745, 748-49 (N.D. Ala. 1982)). At a minimum, notice must inform class members of "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2).

The putative objectors contend that they were not provided with sufficient information in the notice to assess the proposed

_____

settlement notwithstanding these objections, the plaintiffs' motion for limited discovery will be denied as moot.

settlement and their participation in it adequately.  Despite these objections, on independent review I find that the notice program was robust, particularly in its online presence, and implemented as directed in my order authorizing notice.  The notice documents issued, including the claim form, class notice, summary settlement notice, and postcard notice, comport with those I approved in the order authorizing notice.  The settlement received an unusual amount of coverage beyond the administrator's efforts.  Although details would by definition have provided additional instruction regarding the proposed settlement, such detail was not required to be provided in the notice.  I find that notice was given to settlement class members by the best means "practicable under the circumstances." Fed. R. Civ. P. 23(c)(2).

### B.   *Final Class Certification*

Before I may determine whether the class settlement is fair, I must certify the class definitively.  The class was preliminarily certified as: "all persons that, during the Class Period, purchased in the United States certain FiveFingers footwear from Vibram and/or its authorized retailers including, without limitation, vibramfivefingers.com."[10]

---

[10] Excluded from the Class are "(a) Vibram's Board members,

Certification of a class requires "a rigorous analysis of the prerequisites established by Rule 23" of the Federal Rules of Civil Procedure. *Smilow* v. *Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Gen. Tel. Co. of S.W.* v. *Falcon*, 457 U.S. 147, 161 (1982)); *see Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013). Satisfaction of the Rule 23 requirements is necessary even if class certification is requested only for settlement purposes. *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 614, 620 (1997). Indeed, I must conduct this inquiry with heightened scrutiny in order "to protect absentees by blocking unwarranted or overbroad class definitions." *Id.* at 620 & n.16. The only significant difference between considering certification for settlement as opposed to trial is that here, with respect to a settlement class, I need not assess "whether the case, if tried, would present intractable management problems." *Id.* at 620.

---

executive-level officers, or employees, including its attorneys; (b) persons or entities who purchased the FiveFingers footwear primarily for the purpose of resale; (c) any claims for personal injury relating to the use of the FiveFingers footwear; (d) distributors or re-sellers of the FiveFingers footwear; (e) the judge and magistrate judge presiding over the Actions and their immediate families; (f) governmental entities; and (g) persons or entities who timely and properly exclude themselves from the Class as provided in the Settlement Agreement."

To obtain class certification, the plaintiffs must establish each of the four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Smilow*, 323 F.3d at 38 (citing *Amchem*, 521 U.S. at 614). They must also satisfy one of the elements of Rule 23(b) "through evidentiary proof." *Comcast*, 133 S. Ct. 1432. Here, the plaintiffs seek certification under Rule 23(b)(3).

### *C. Analysis*

#### 1. Numerosity

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." The plaintiffs contend that "millions" of pairs of FiveFingers footwear were sold in the United States by Vibram and its authorized retailers during the relevant period, from March 2008 through May 2014. Even if this is a high estimate, plainly the class is sufficiently numerous for certification purposes. *Cf. In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005) (finding class of "tens if not hundreds of thousands of consumer-purchasers" to be sufficiently numerous). While the class is large, the individual members were unidentifiable by Vibram before notice,[11] and the claims of each class member are

---

[11] The fact that the class members are unidentifiable to the

relatively small; as a consequence, joinder of all members in some manner other than a class action would be impracticable. *See In re M3 Power Razor Sys. Mktg. & Sales Practice*, 270 F.R.D. 45, 54 (D. Mass. 2010).

### 2. Commonality

Under Rule 23(a)(2), there must be "questions of law or fact common to the class."  This requirement carries a low threshold and "requires only that resolution of the common questions affect all or a substantial number of the class members."  *Lupron*, 228 F.R.D. at 88; *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("common contention" required for class certification "must be of such a nature that it is capable of classwide resolution—which means that

---

defendants does not render the class unascertainable.  *See Kent* v. *SunAmerica Life Ins. Co.*, 190 F.R.D. 271, 278 (D. Mass. 2000) (ascertainable class is one for which it is "administratively feasible for the court to determine whether a particular individual is a member").  The question of ascertainability has achieved greater attention as of late in other circuits, which have considered skeptically consumer classes in which the only or primary way to identify members is through their own self-identification as purchasers of the product.  *See Hayes* v. *Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013); *Marcus* v. *BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012); *see also Stewart* v. *Beam Global Spirits & Wine Inc.*, Civ. No. 11-5149, 2014 WL 2920806, at *2 (D.N.J. June 27, 2014); *Ebin* v. *Kangadis Food Inc.*, 297 F.R.D. 561, 566-567 (S.D.N.Y. 2014); *Weiner* v. *Snapple Beverage Corp.*, No. 07-cv-8742, 2010 WL 3119452 at *12 (S.D.N.Y. Aug. 5, 2010).  But the law in the First Circuit does not dictate rejection of such a class.

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

The class members would be required to establish several common issues of fact and law to prove the defendants' liability and their entitlement to damages.[12]  These include that they purchased FiveFingers footwear during the relevant period (and not for the purposes of resale), that Vibram made representations of health benefits in advertising and marketing this footwear, that these health benefits were not supported by scientific evidence, that Vibram knew that the scientific evidence did not support such benefits, and that the advertising and marketing was false and deceptive.  *See* Mass. Gen. Laws ch. 93A, §§ 2, 9; Mass. Gen. Laws ch. 266, § 91.  Class members would also need to establish an injury, namely that they would not have purchased FiveFingers if they had known the advertised health benefits were untrue or that they relied at least in part

---

[12] Bezdek's complaint asserts violations of two provisions of Massachusetts law, both of which survived the motion to dismiss: Mass. Gen. Laws ch. 266, § 91, which imposes liability for false or misleading advertising, and Mass. Gen. Laws ch. 93A, §§ 2, 9, which imposes liability for unfair and deceptive practices.  A violation of Mass. Gen. Laws ch. 266, § 91, can afford only injunctive relief.  As a result, any damages award under Massachusetts law for the class members must be based on chapter 93A.

on these misrepresentations in choosing to purchase the footwear (a so-called "price premium" injury). *See Ruiz* v. *Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (chapter 93A claim requires injury in the form of "either economic or noneconomic" loss).

There are, of course, likely differences between class members within several of these categories, most importantly with regard to injury. Class members may have purchased different types of FiveFingers footwear for very different purposes, and they may have seen and been influenced (or not influenced at all) by different advertising and assertions by Vibram, although the plaintiffs have demonstrated that at least some of the advertising at issue was national in scope. Nonetheless, the core issues of fact and law in this case regarding alleged misrepresentation of health benefits are common to all class members and present "a need for combined treatment and a benefit to be derived therefrom." *Lupron*, 228 F.R.D. at 88 (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)); *see Werdebaugh* v. *Blue Diamond Growers*, No. 12-CV-2724, 2014 WL 2191901, at *12 (N.D. Cal. May 23, 2014). As will be discussed more fully below, "[c]hapter

93A . . . provides a cause of action common to all class members against the defendant." *M3 Power Razor*, 270 F.R.D. at 56.

### 3. Typicality

Under Rule 23(a)(3), "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." This element is satisfied "if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Lupron*, 228 F.R.D. at 89. The claims of the class representative and the class overall must share essential characteristics, but they need not be precisely identical. *See Swack* v. *Credit Suisse First Bos.*, 230 F.R.D. 250, 260 (D. Mass. 2005).

The claims of the class members here arise from the allegedly false and misleading advertising and marketing materials for Vibram's FiveFingers footwear purporting that the footwear offers health benefits. There are no allegations that this advertising or the representations were delivered differently in different jurisdictions or as to different categories of consumers. The class representative (Bezdek), the two other named plaintiffs in the related cases subject to the settlement (DeFalco and Safavi), and the class members were

allegedly exposed to the same advertising and marketing materials that, they assert, induced them to buy FiveFingers footwear.  If this advertising was deceptive, and if the class members were exposed to that advertising in purchasing the footwear, then they all experienced a similar economic loss. The claims and injuries of the class representative therefore arise from "the same events or course of conduct as do the [claims and] injuries that form the basis of the class claims." *In re Bank of Bos.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991).

### 4.  Adequate Representation

Under the last required element of Rule 23(a), I must determine that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement, along with those of commonality and typicality, "serve[s] as [a] guidepost[] for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 157 n.13.

This is a two-part requirement.  First, the plaintiffs must establish "that the interests of the representative party will

not conflict with the interests of any of the class members."
*Andrews* v. *Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.
1985).  Second, the plaintiffs must show "that counsel chosen by
the representative party is qualified, experienced and able to
vigorously conduct the proposed litigation."  *Id.*  The First
Circuit has noted that this element "is particularly important
because of the *res judicata* implications of a class judgment."
*Id.*

The first prong is addressed in large part by my conclusion
that Mass. Gen. Laws ch. 93A provides a serviceable and
appropriate cause of action common to all class members.
Bezdek's interests align with those of the class as a whole,
because all seek redress from the same injury: the purchase of
FiveFingers footwear based on Vibram's misrepresentation of its
health benefits.  *Cf. M3 Power Razor*, 270 F.R.D. at 55.  There
are no material differences in potential recovery as the case
stands currently, and there appears to be no meaningful conflict
between the interests of the class representative and those of
the absent class members.  In *M3 Power Razor*, a marketing and
sales practice multidistrict litigation matter, I assessed the
potential for intraclass conflicts and concluded, "[a]fter
extended review of the various legal regimes" potentially

applicable in that case, "that, although variations in state law exist, they do not overcome the common factual and legal issues shared by the potential class members." *Id.* at 60-61. That conclusion is equally applicable to the commonality, predominance, and adequacy of representation issues presented by the class settlement proposed in this case.

The second prong pertains to the qualifications of lead class counsel, Wolf Haldenstein Adler Freeman & Herz LLP. The plaintiffs have submitted significant documentation indicating the firm's experience in complex consumer class action litigation and its efforts in advancing this matter in particular.[13] I find that lead counsel has performed competently and professionally in the management of this action, and that the representation is adequate for the purposes of Rule 23(a)(4).[14]

---

[13] I note that the plaintiffs have also submitted significant documentation as to the qualifications and experience of the myriad other plaintiffs' counsel in this case, in large part to justify the requested attorneys' fees. This information is helpful in assessing the adequacy element of class certification as well.

[14] Objector Narkin has alleged that class counsel engaged in unethical behavior in another class action case, has engaged in improper use of a confidentiality agreement in this case, and should be removed as class counsel because its actions constitute "indicia of a consciousness of unfairness and collusion." I find this objection to lack merit. As the

<u>5</u>.   <u>Rule 23(b)</u>

Under Rule 23(b)(3), class certification is appropriate if I find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

*a.  Predominance*

The predominance requirement is similar to but more demanding than the commonality requirement. *See Comcast*, 133 S. Ct. 1432 (citing *Amchem*, 521 U.S. at 623-24); *Wal-Mart*, 131 S. Ct. at 2548.  The question is whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  This requires identifying "a sufficient constellation of common issues [to] bind [ ] class members together." *Waste Mgmt. Holdings, Inc.* v. *Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).  As with the

---

plaintiffs observe, Narkin has asserted an identical, unsuccessful claim in a separate class action in which lead counsel was involved.  *See Arnold* v. *FitFlop USA, LLC*, No. 11-CV-0973W(KSC), 2014 WL 1670133, at *8 (S.D. Cal. Apr. 28, 2014). There, the court concluded that Narkin's identical objections lacked merit and were not made in good faith.  *Id. See Arnold* v. *FitFlop USA, LLC*, No. 11-CV-0973W(KSC), 2014 WL 3014679, at *2 (S.D. Cal. July 3, 2014).  There is nothing in the record before me to justify a different conclusion in this case.

commonality requirement, however, precise alignment of all issues in the litigation is not necessary. *See Smilow*, 323 F.3d at 39.

The core questions in this case — whether Vibram's advertising was false or misleading, whether its conduct violated the causes of action identified in Bezdek's amended complaint, and whether the class members suffered injury and are entitled to damages as a result of this conduct — are common to all class members. *Cf. M3 Power Razor*, 270 F.R.D. at 56. There are, of course, potential differences among the class members. Of greatest import are the standards for establishing causation and the calculation of damages. In *Comcast*, the Supreme Court required that the plaintiffs demonstrate with specificity a class-wide methodology for calculating damages, based on the single theory of liability the district court judge considered to be capable of class-wide proof, in order to obtain class certification. *See Comcast*, 133 S. Ct. at 1430, 1433. Because the proffered calculation model in *Comcast* measured damages attributable to both the salient theory and three others the court rejected, the model "[could not] possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 26(b)(3)." *Id.* at 1433. The Court

therefore determined that class certification should have been denied. *Id.* at 1435. Similarly, in *Kelley* v. *Microsoft Corp.*, No. C07-0475-MJP, 2009 WL 413509, at *2, *6 (W.D. Wash. Feb. 18, 2009), Judge Pechman decertified a class because the plaintiffs had failed to present a viable method of proving class-wide causation on a price inflation theory, which required identifying a specific shift in the demand for the product at issue, because they did not isolate the alleged misrepresentation "as a cause of a shift in demand in the market."

In this case, I have narrowed the theory of injury to one of a price premium paid. The plaintiffs have not proffered any fully developed and particularized methodology for calculating damages using this theory and have instead merely recognized the difficulty in identifying such a methodology. The plaintiffs' deflection does not, however, lead me to ignore the Supreme Court's direction in *Amchem* to review class certification at the settlement stage with greater, not lesser, scrutiny than on a motion for class certification anticipating trial. Settling prior to formal class certification does not permit the parties to avoid these challenges to the certification process.

Nevertheless, although *Comcast* heightens the evidentiary burden on plaintiffs seeking class certification in certain circumstances, I do not believe it is fatal to the certification sought here. While the plaintiffs have not provided chapter and verse to address the *Comcast* requirement of presenting a methodology that would allow damages to be calculated with precision on a class-wide basis, they have tendered an acceptable general damages theory. I do not employ a different standard for considering class certification where a settlement agreement has been reached, but I do adopt a common sense approach to the *Comcast* dimension to the settlement and what it offers.

At trial, class members would be required to prove an injury resulting in economic loss. The class as defined does not limit membership to individuals who relied on the alleged health benefits in purchasing the shoes – indeed, such a provision in the definition would render it subjective and questionable for other reasons. As a result, however, there may be class members who did not rely on the representation of health benefits, or who purchased the footwear for other reasons entirely. Those class members might therefore be said to stand apart from those who relied on the representations in choosing

to pay the price for FiveFingers footwear, because they could not establish causation under certain legal theories.

By employing a broad definition of the class that includes individuals who purchased FiveFingers footwear during the relevant time period for any reason (other than resale), the settlement provides relief to the broadest class of individuals to whom relief would potentially be available.  As I noted in *M3 Power Razor*, "the protections provided by . . . Mass. Gen. Laws ch. 93A, § 9, are quite robust and arguably more consumer friendly" than any other state consumer protection provision. *M3 Power Razor*, 270 F.R.D. at 60.  "Chapter 93A does not require [a showing of] reliance." *Id.*  This circumstance effectively eradicates potential intraclass differences.  The broadly inclusive claims here therefore do not present challenges as to class-wide calculation of damages.  Of those who would be eligible for relief, the calculation of damages would turn on the price premium of the purported health benefits. *Cf. Comcast*, 133 S. Ct. at 1430 (plaintiff must establish that individual injury resulted from alleged antitrust violation and that the injury was "capable of proof at trial through evidence . . . common to the class rather than individual to its members").

Courts must, of course, exercise caution in certifying a class "when individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 625. But all class members here stand to recover only what the price premium theory permits, which under no circumstances would exceed the market value of the footwear. The defendants valued this ex ante as no more than approximately $94, the average cost of a pair of footwear. Damages calculations at trial, of course, could lower this amount substantially. After notice, it appears that the settlement affords class members approximately $8.44 per pair. Although this is notably less than the theoretical maximum potential relief available at trial, it appears as a practical matter in the range of what any class member could reasonably expect through pursuit of an individual claim, if it were feasible.

This analysis is consistent with that reached in two similar cases. In *Arnold* v. *FitFlop USA, LLC*, No. 11-CV-0973W(KSC), 2014 WL 1670133, at *2 (S.D. Cal. Apr. 28, 2014), Judge Whelan certified for settlement purposes a nationwide class of purchasers of certain footwear who presented legal claims of misrepresentation of health benefits in violation of California consumer protection laws based on a price premium

theory of injury.  *Arnold*, 2014 WL 1670133 at *2.  He concluded

that the named plaintiff and all of the class members were

"entitled to the same legal remedies premised on the same

alleged wrongdoing," that is, "whether Defendant's claim that

[the footwear at issue, with its proprietary technology],

provided the strengthening and toning benefits, and whether that

representation was false or deceptive to the reasonable

consumer."  *Id.* at *3.

In another similar case regarding the alleged

misrepresentation of health benefits associated with certain

footwear in violation of California consumer protection laws on

behalf of a nationwide class, Judge Russell noted the potential

class certification problems that this case shares and after

considering them ruled in favor of settlement.  *See In re*

*Skechers Toning Shoe Prods. Liability Litig.*, MDL No. 2308, 2012

WL 3312668, at *5 (W.D. Ky. Aug. 13, 2012).  He found that the

predominance requirement was satisfied because the issue of

"whether Skechers violated the consumer protection laws . . . .

through misleading and deceptive sales and marketing practices

is a question that is common to all class members," and observed

that "[t]he proof that the representative plaintiffs would be

required to produce in order to substantiate their allegations

would be the same proof required of all class members." *Id*. He noted that "[w]ithout a determination on these common questions, no class member, proceeding collectively or individually, would be entitled to any recovery." *Id.*

I conclude that no "[q]uestions of individual [injury and] damage calculations" are present here that would "inevitably overwhelm questions common to the class," and consequently that the predominance requirement is satisfied. *Comcast*, 133 S. Ct. at 1433.

### b.  Superiority

A class action is a superior means for adjudicating this issue fairly and effectively.  Where there are thousands of class members, each of whom have small individual claims that may not be worth pursuing independently, "a class action is the only feasible mechanism for resolving the dispute efficiently," *M3 Power Razor*, 270 F.R.D. at 56, and is clearly superior to "piecemeal adjudication of numerous separate lawsuits covering the same or substantially similar issues." *Swack*, 230 F.R.D. at 273.  This class action is of that type.  It is clear, given the common interests across class members and the class representative, that this class action "would achieve economies of time, effort, and expense, and promote . . . uniformity of

decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 advisory committee's notes (1966)).

The District of Massachusetts is also the superior forum for this class action. As in *M3 Power Razor*, a consumer class action against a Massachusetts corporate defendant alleging misrepresentations made in advertising and promotional materials in violation of Chapter 93A, the Massachusetts consumer protection statute, pursued on a consolidated basis in this district "is superior to any other mechanism for adjudicating the case." *M3 Power Razor*, 270 F.R.D. at 56-57.

### D. Conclusion

Based on the above analysis, I conclude that the plaintiffs have met their burden of establishing compliance with each of the requirements of Rule 23(a) and of Rule 23(b)(3). Accordingly, I certify the class, as defined above, with finality for the purpose of settlement.

### III. FAIRNESS DETERMINATION

### A. Legal Standard

Under Federal Rule of Civil Procedure 23(e)(2), a settlement must be "fair, reasonable, and adequate." *See Nat'l*

*Ass'n of Chain Drug Stores* v. *New Eng. Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009).  My role in reviewing the proposed settlement is that of a fiduciary for the absent class members, protecting them from an unjust or unfair settlement.  *See Lupron*, 228 F.R.D. at 93. (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*, 55 F.3d 768, 805 (3d Cir. 1995)); *see also Amchem*, 521 U.S. at 623.

As the First Circuit has observed, the case law "offers laundry lists of factors" for conducting this inquiry, "most of them intuitively obvious and dependent largely on variables that are hard to quantify."  *Nat'l Ass'n*, 582 F.3d at 44.  All speak to the core question of the reasonableness of the settlement in light of the uncertainties of litigation.  *See Bussie* v. *Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999) (fairness inquiry involves "studied review of a wide variety of factors" rather than "a single inflexible litmus test").  There is a presumption that a settlement is within the range of reasonableness "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length."  *City P'ship Co.* v. *Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *see In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009).  This is the

threshold required to survive the preliminary review stage. However, more than presumptive fairness is required for final approval, which necessarily entails a "more fully informed examination." *M3 Power Razor*, 270 F.R.D. at 62.

One list of factors often employed in this district in conducting a final review of a proposed settlement is that provided by the Second Circuit in *Detroit* v. *Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *overruled on other grounds by Missouri* v. *Jenkins*, 491 U.S. 274 (1989). *See New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.,* 602 F. Supp. 2d 277, 281 (D. Mass. 2009); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005); *Lupron,* 228 F.R.D. at 93-94. These factors include: "(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of

the settlement fund to a possible recovery in light of all the
attendant risks of litigation." *Grinnell*, 495 F.2d at 463.

Variations on and abbreviations of this list can also be
found. *See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig.*,
535 F. Supp. 2d 249, 259 (D.N.H. 2007); *In re Compact Disc
Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 206
(D. Me. 2003). Bearing in mind these various formulations of
the fairness inquiry and the particular circumstances of the
case at hand, I will employ (at the risk of adding to the
collective laundry basket) my own evaluation of the key
considerations as I see them in reviewing the proposed
settlement in this case.

### B. *Fairness Analysis*

#### 1. Prospects of the Case

I consider first the likely complexity, expense, and
duration of the litigation, were this case to proceed to trial,
as well as the plaintiffs' likelihood of success on the merits.
As for the likely complexity and expense, the plaintiffs have
identified meaningful concerns with class certification and
would need to litigate these issues more fully in order to
proceed to trial. Both parties would conduct further discovery,
including extensive expert discovery, followed very likely by a

motion for summary judgment and renewed settlement discussions. All of these efforts would extend the litigation and associated costs further, decreasing the net benefit of any damages award obtained at trial.

As for the merits of the plaintiffs' case, the documentary evidence demonstrates that the defendants did indeed promote health benefits associated with wearing FiveFingers footwear and running "barefoot," and the plaintiffs have made plausible allegations that these benefits are not supported by scientific research. These strengths in the plaintiffs' case must confront two sizable hurdles as to injury and damages.

As I discussed in my ruling on the motion to dismiss in the *Bezdek* action, the alleged injury is one of economic loss: that the plaintiffs would not have purchased the footwear had they known it would not provide the advertised health benefits, or that the footwear was not worth what the plaintiffs paid for it. *See Bezdek*, 2013 WL 639145, at *4. The loss, using a price premium theory, would be the difference among the value of the FiveFingers footwear with and without the purported health benefits. The plaintiffs would bear the difficult burden of establishing that such a difference in value existed and that there was a causal connection between the decision to purchase

the shoes and this loss. *See Rule* v. *Fort Dodge Animal Health, Inc.*, 604 F. Supp. 2d 288, 298-304 (D. Mass. 2009) (summarizing the development and state of the injury requirement under Mass. Gen. Laws c. 93A, § 9(1)), *aff'd*, 607 F.3d 250, 253-54 (1st Cir. 2010).

The plaintiffs would also need to provide specific calculations for damages. Class counsel has represented that it could either isolate the value of the challenged benefits or prove the premium the plaintiffs paid for the deceptively advertised health benefits, but has not presented any fully developed proxies helpful in running these calculations or detailed any mechanisms for quantifying the necessary variables other than suggesting that Hedonic regression or conjoint analysis could prove useful. In light of these challenges, it is very possible that the defendants could establish that the plaintiffs suffered no compensable loss by arguing that the footwear retains full value as a running shoe, regardless of whether it affords additional advertised health benefits, or could prevail because a price premium simply cannot be determined given the uniqueness of the particular product. *Cf. id.* at 304.

It is clear, then, that the plaintiffs have some, but not an entire, likelihood of success on the merits, and that pursuing this case to trial would require the plaintiffs to conduct extensive expert discovery (likely at great cost) in order to establish the materiality of the challenged advertising and prove their theory and an adequate calculation for recoverable damages. This added cost of litigation, combined with the risks inherent in pursuing a claim based on a price premium theory of injury, demonstrate palpable uncertainty that a more favorable result could be obtained through litigation. This factor thus weighs in favor of settlement for the benefit of the class overall.

### 2. Value of the Settlement

I next consider the value of the settlement to the class members. The key question is whether the relief provided by the settlement is reasonable in relation to the likely outcome were the case to proceed to trial. In assessing the reasonableness of a proposed settlement, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *Gen. Motors*, 55 F.3d at 806 (quoting Manual for Complex Litigation (Second)

§ 30.44).  Were this case to proceed to trial, the damages under a price premium theory would amount to something less than the market value of the footwear as purchased with its purported health benefits, and the difficulties in proving this amount could prove fatal to meaningful recovery in the case.

The terms of the agreement provided for a refund of up to $94, the average manufacturer's suggested retail price of FiveFingers footwear, per pair of eligible footwear purchased, to class members who submit valid claim forms during the claim period.[15]  That would surely have provided a more favorable outcome for class members than what could be achieved through trial.  The actual relief to be provided, however, is much lower.  Following the close of the claim period, the settlement administrator determined that there were valid claims submitted for approximately 268,570 pairs of FiveFingers.  Subtracting from the settlement fund the necessary expenses, this results in a refund of approximately $8.44 per pair,[16] which constitutes about 9% of the average price paid for the footwear.

---

[15] There is no cap on the number of pairs for which an individual may seek a refund.  Proof of purchase is required only for those claimants seeking refunds on more than two pairs of footwear.

[16] This is calculated as follows:  The settlement fund consists of $3,750,000.  Deducted from that fund are attorneys' fees ($937,500), attorneys' expenses ($61,674.44), plaintiffs'

It is impossible for me to determine with certainty at this stage what the price premium paid by consumers for the purported health benefits of FiveFingers footwear could be. However, it is not unreasonable to think that the price premium could be in the 9% range or lower, given the defendants' representations that the footwear has primary value as a running shoe aside from any additional health benefits the shoe may or may not confer. There is also the meaningful risk that the plaintiffs could not establish any price premium injury. The relatively modest settlement payout that has crystallized following notice is a preferable outcome for class members.

Settlement is, of course, "a compromise, a yielding of the highest hopes in exchange for certainty and resolution," *Gen. Motors*, 55 F.3d at 806, and the benefit to both parties is that they will avoid the outcome embodying their worst nightmares after taking the case to trial. The class members' highest hope here is that they could achieve something closer to the price paid for the shoes. Their worst-case scenario, and a plausible one, is that they would receive no damages award at all. The

service awards ($6,500), and administrative costs ($483,955.11). Credited to that fund is anticipated interest from the escrow account of $2,354.98. This results in a settlement fund of $2,262,725.43. Divided by 268,570 pairs eligible for a refund through timely, valid claims, this amounts to approximately $8.425 per pair.

refund provisions of this agreement therefore provide class members with something less favorable than the best outcome, potentially on par with a likely outcome (an amount equivalent to the price premium paid for the purported health benefits), and something more favorable than the worst outcome.[17] *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, No. 09-civ-2067, 2014 WL 4446464, at *7 (D. Mass. Sept. 8, 2014) ("A settlement need not reimburse 100% of the estimated damages to class members in order to be fair").

The proposed agreement also provides for injunctive relief in the form of the defendants' discontinuance of aspects of their advertising and marketing campaigns promoting the health benefits of FiveFingers footwear, unless the defendants obtain "competent and reliable scientific evidence to substantiate" such claims as true. The objectors contend that this

_____

[17] I expressed concerns to the parties at the fairness hearing that the terms of the agreement left open the possibility that class members could receive no refund at all. Although a floor on recovery is not a required element of such settlement agreements, it provides assurances that the agreement intends to confer a meaningful benefit on all class members. *Cf. In re M3 Power Razor Sys. Mktg. & Sales Practice*, 270 F.R.D. 45, 63 (D. Mass. 2010). At and following the hearing, the parties provided me with specific information regarding the number of claims and the anticipated refund amount per pair based on final calculations of the expenses to be deducted from the fund. I am satisfied by these submissions that, under the circumstances, the settlement agreement structure will not deprive class members of a recovery.

constitutes an illusory promise of no value to class members, as the defendants are merely promising to make honest representations, as they are required by law to do regardless, and such changes in advertising do not undo the damage that class members may have suffered in relying on previous false advertising by the defendants. In response, the plaintiffs contend that "the veracity of Vibram's advertising was the most hotly contested issue in this litigation" and that this relief prevents the defendants from engaging in precisely the conduct that caused the alleged injury in the first place.

Injunctive relief has been recognized as a meaningful component of a settlement agreement, particularly where it mimics the injunctive relief that the plaintiffs could achieve following trial. *See Nilsen* v. *York Cnty.*, 382 F. Supp. 2d 206, 213 (D. Me. 2005). Similar provisions have been included in approved settlement agreements against other footwear providers facing similar allegations of misrepresentation of purported health benefits. *See, e.g., Arnold*, 2014 WL 1670133, at *6; *Skechers Toning*, 2013 WL 2010702, at *3, *10. I find the injunctive relief to be a valuable contribution to this settlement agreement. Overall, the relief afforded by the

proposed settlement is reasonable and appropriate in light of the uncertainty of a better outcome at trial.

### 3. Reaction of the Class to the Settlement

The reaction of the class to the settlement has been overwhelmingly positive. The settlement produced a far higher claim submission rate than the parties expected, yielding 154,927 claims for 279,570 pairs, and only 23 opt-outs and 3 objections.[18] *Compare Relafen*, 231 F.R.D. at 72 (reaction to settlement was positive with 5,489 claims, 140 opt-outs, and 10 objections); *Lupron*, 228 F.R.D. at 96 (reaction to settlement was positive with 10,614 consumer claims, 49 opt-outs, and 10 objectors).

### 4. Stage of the Proceedings, Quality of Counsel, and Conduct of Negotiations

I next consider whether the discovery and other proceedings leading up to the proposed settlement agreement provided the parties with adequate information as to their respective litigation positions in order to act intelligently in negotiations. *See M3 Power Razor*, 270 F.R.D. at 63; *Rolland* v. *Cellucci*, 191 F.R.D. 3, 6 (D. Mass. 2000).

---

[18] At least one member who opted out expressed a desire to pursue an individual action, whereas several members who opted out indicated their loyalty to Vibram and lack of injury from the representations of health benefits.

Bezdek's complaint was filed in March 2012, and the parties first discussed settlement September of that year.[19]  In December, the parties committed to attend a two-day mediation session in January 2013, but after attending the first day they determined that they were too far apart to reach an agreement.[20] Beginning in April 2013, following my ruling on the defendants' motion to dismiss, which focused the available theory of injury in the case, the parties began meaningful discovery efforts. The defendants produced over 40,000 documents, including advertisements, marketing plans, studies pertaining to the health benefits associated with the footwear and/or barefoot running, financial and sales information, communications with government agencies and consumers, and documentation regarding Vibram's agents, vendors, and consultants.  The plaintiffs also received information from third parties regarding the defendants' print and online advertising and media plans.

Following these document disclosures, the defendants served a request for production on the plaintiffs, to which the

---

[19] The defendants indicate that they experienced a significant business impact and reduced sales soon after the filing of the *Bezdek* action, hence its motivation to settle early.

[20] Prior to mediation, the defendants produced sales data and studies supporting their advertising claims.  The plaintiffs apparently brought contrary scientific studies to mediation.

plaintiffs provided written responses.  The parties also both
served deposition notices in November and December 2013.  At
that time, the parties resumed settlement discussions.  Between
December 6 and December 12, 2013, counsel engaged in significant
communication about the possibility of settlement, reaching an
agreement in principle on December 12.  The parties thereafter
successfully sought to stay further discovery, although they had
not yet completed written discovery or conducted any
depositions.

This discovery period is less exhaustive than that in a
number of class action settlements that have been approved in
this district.  *See M3 Power Razor*, 270 F.R.D. at 63 (settlement
was reached after defendant produced over 100,000 pages of prior
litigation documents and of pertinent financial information, and
after the deposition of a defendant representative); *Relafen*,
231 F.R.D. at 73 (settlement was reached after plaintiffs
reviewed "more than one million pages of documents," "more than
fifty depositions of fact witnesses," and "more than twenty-five
expert witnesses"); *Lupron*, 228 F.R.D. at 96-97 (settlement was
reached after "500 boxes of documents totaling over a million
pages had been produced by the defendants" and "[t]wenty-six
depositions had been taken"); *In re Compact Disc Minimum*

*Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 188-89
(D. Me. 2003) (settlement was reached after "review of hundreds
of thousands of documents giving the parties ample opportunity
to learn about the prospects or pitfalls of their respective
cases," as well as the depositions of the named plaintiffs).

However, the question is only incidentally answered
quantitatively by the number of pages in the documents that were
produced or witnesses who were deposed.  Rather, the answer must
ultimately be a qualitative one: whether the parties conducted
sufficient discovery "to make an intelligent judgment about
settlement."  *Hochstadt* v. *Boston Scientific Corp.*, 708 F. Supp.
2d 95, 107 (D. Mass. 2010).  Lead class counsel recognizes that
my ruling on the defendants' motion to dismiss in February 2013,
as well as the production of discovery by the defendants in the
months following that ruling, made clear that the plaintiffs
faced significant hurdles in pursuing the litigation to trial.
Indeed, these hurdles suggested to the plaintiffs that settling
prior to class certification and trial might present a better
outcome.

I find that the parties had a sufficient understanding of
the merits of the case in order to engage in informed
negotiations, particularly where plaintiffs' counsel are skilled

and experienced in consumer class action litigation, including class actions involving alleged misrepresentation of the health benefits of footwear. *See New Eng. Carpenters*, 602 F. Supp. 2d at 282. Although a significant amount of the attorneys' time in this case was spent on negotiations,[21] the parties engaged in meaningful discovery efforts and motion to dismiss practice in all three underlying actions that afforded greater insight into the merits of the litigation for purposes of those negotiations.

### C.  The Release Provision

One of the objectors challenges the release provision on the basis that it is not readable by laypeople and includes unnamed parties.  "[I]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." *City P'ship*, 100 F.3d at 1044 (quoting *TBK Partners, Ltd*. v. *Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

---

[21] Counsel for both parties represent that they engaged in multiple rounds of intensive negotiations and expended significant time and effort in reaching this agreement.

The release in the agreement applies to "Vibram, its parents . . . officers, directors, employees, stockholders, agents, attorneys, administrators, successors, reorganized successors, spin-offs, assigns, holding companies, subsidiaries, affiliates, joint-ventures, partners, members, divisions predecessors, Vibram-owned U.S. Retailers, Vibram-owned Stores and www.vibramfivefingers.com."  The release covers only those claims or actions "on the basis of, connected with, arising from, or in any way whatsoever relating to the purchase of FiveFingers footwear during the Class Period and the claims alleged in the complaint," and expressly excludes from the release any claims of or relating to personal injury.  The release employs standard terminology and is appropriately tailored and reasonable in light of the underlying complaints.

### D.  *Conclusions*

I am satisfied that counsel has worked diligently to achieve a favorable settlement agreement for the plaintiffs and the class overall in light of the anticipated challenges of taking this case to trial.  I find the agreement to be fair, reasonable, and adequate under Rule 23.

### V. REQUEST FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS

#### A. *Request for Attorneys' Fees*

On behalf of all plaintiffs' counsel, lead class counsel has requested attorneys' fees of $937,500, equivalent to 25% of the settlement fund, and reimbursement for actual expenses of $61,674.44.[22] The three objectors contend that the requested fees are excessive in light of the minimal motion practice preceding the settlement agreement and the limited result obtained for the class by counsel. Objector Cain also asks that the fee request be given heightened scrutiny in light of the clear sailing provision in the agreement, which provides that the defendants will not oppose an application for an award of attorneys' fees and expenses within the articulated parameters.

Attorneys in a certified class action may be awarded reasonable fees and costs, subject to the wide discretion of the trial judge. Fed. R. Civ. P. 23(h). *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995); *Weinberger* v. *Great Northern Nekoosa Corp.*, 925 F.2d 518, 523 (1st Cir. 1991). Under the common fund doctrine, where attorneys succeed in obtaining a

---

[22] The terms of the proposed agreement (subject to my approval) permitted a request of up to 25% of the settlement fund, or $937,500, in attorneys' fees, and up to $70,000 in expenses.

fund that benefits the class, they are entitled to "a reasonable attorney's fee from the [settlement] fund as a whole." *Boeing Co.* v. *Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted). This is rooted in "the equitable principle that those who have profited from litigation should share its costs." *Thirteen Appeals*, 56 F.3d at 305 n.6. Where a settlement agreement contains a clear sailing provision, I engage in somewhat heightened scrutiny to ensure that the request is not the product of collusion. *See Stokes* v. *Saga Int'l Holidays, Ltd.*, 376 F. Supp. 2d 86, 89-90 (D. Mass. 2005).

The First Circuit recognizes two methods for calculating attorneys' fees in the class action context. *See Thirteen Appeals*, 56 F.3d at 307. Under the "percentage of the fund" ("POF") method, counsel may be awarded a reasonable percentage of the common fund. *Id.* at 305, 307. Within the First Circuit, courts generally award fees "in the range of 20-30%, with 25% as 'the benchmark.'" *Latorraca* v. *Centennial Techs., Inc.*, 834 F. Supp. 2d 25, 27-28 (D. Mass. 2011) (collecting cases).

Although the POF method is generally favored in the class action context because it is less burdensome and "better approximates the workings of the marketplace," the First Circuit also recognizes the "lodestar" method for calculating attorneys'

fees.  *Thirteen Appeals*, 56 F.3d at 306-07.  Under that method,
the court "determine[s] the number of hours reasonably expended
multiplied by a reasonable hourly rate for attorneys of similar
skill within that geographic area."  *Relafen,* 231 F.R.D. at 77;
*see Spooner v. EEN, Inc.*, 644 F.3d 62, 68 (1st Cir. 2011).  This
calculation is further "subject to a multiplier or discount for
special circumstances, plus reasonable disbursements."  *Compact
Disc*, 216 F.R.D. at 215-16.  Although the lodestar serves as a
base figure, the court may modify it by subtracting hours that
are excessive in light of the legal task, not recorded with
sufficient specificity as to the tasks performed, or redundant
to hours of another lawyer without justification for the need
for duplicity.  *See Walsh* v. *Boston Univ.*, 661 F. Supp. 2d 91,
105-07 (D. Mass. 2009).  The lodestar calculation may be used
alone or as a check on the appropriateness of a POF calculation.
*Compact Disc*, 216 F.R.D. at 215-16; *see* Manual for Complex
Litigation (Fourth) § 14.122.  Here, I have used it as a means
to evaluate the reasonableness of a POF-based request.

Regardless of the calculation method employed, the
touchstone of the inquiry is reasonableness.  *See In re
Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 738 (1st Cir. 1999).
I function in some respects "as a quasi-fiduciary to safeguard

the corpus of the fund for the benefit of the plaintiff class"
and must therefore weigh the interests of the attorneys in being
compensated for their efforts against the interests of the class
members. *Id.* at 736. Although the First Circuit has not
recognized a particular set of factors for use in assessing the
reasonableness of a fee request, I engage in the same approach
that other judges in this circuit have employed when making
fairness determinations. *See In re Puerto Rican Cabotage
Antitrust Litig.*, 815 F. Supp. 2d 448, 458 (D.P.R. 2011); *In re
TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 401 (D.
Mass. 2008); *Relafen*, 231 F.R.D. at 79; *Lupron*, 228 F.R.D. at
98; *cf. Coutin* v. *Young & Rebuicam P.R., Inc.*, 124 F.3d 331, 337
n.3 (1st Cir. 1997).

The plaintiffs' request for 25% of the settlement fund in
fees falls squarely within what is recognized in this circuit as
the range of reasonable POF amounts. *See Latorraca*, 834 F.
Supp. 2d. at 27-28. Through the fairness hearing, plaintiffs'
counsel expended 2,492.25 hours, creating a lodestar of
$1,369,393.25. The requested fee therefore represents roughly
68% of the lodestar. My focus in assessing the reasonableness
of this request is on whether plaintiffs' counsel have
demonstrated that "the fund conferring a benefit on the class

resulted from" the efforts of the attorneys. *See Thirteen Appeals*, 56 F.3d at 307.

Weighing in favor of the requested fee is the skill of the attorneys involved, whom I acknowledge as being nationally known for and greatly experienced in representing plaintiffs in such consumer class action lawsuits. I also credit the efforts that plaintiffs' counsel has made during the course of this litigation. This action began in March 2012 with Plaintiff Bezdek, and has expanded to include other plaintiffs and other counsel over time. The case has involved some significant motion practice, including motions to dismiss in each of the three actions, as well as an attempt at mediation in January 2013. I acknowledge counsels' representations that the parties engaged in extensive fact discovery, which led to Vibram's production of over 40,000 pages of documents as well as other discovery materials which were used during the course of litigation and settlement preparation. Although a proposed settlement was reached prior to identification to the court of a class certification expert or a motion to certify the class, prior to the deposition of any witnesses including the named plaintiffs themselves, and prior to the more substantial summary judgment motion practice that I often see in a case such as

this, I find that plaintiffs' counsel engaged in intensive efforts to move the case forward to a favorable result for the class members, without incurring the additional expense and time of conducting depositions and expert discovery.

The relief afforded by the settlement (approximately $8.44 per pair and injunctive relief) is reasonable in relation to the uncertainty of success at trial. The reaction of the class to the settlement has been overwhelmingly positive, as evidenced by the quite high number of claims filed and the quite low number of opt-outs.[23] Where I must "balance the interests of the Class Plaintiffs, who have received only a fraction of the damages

---

[23] In assessing the reasonableness of the requested fee, I have considered the concerns raised by the objectors. Although Cain's objection asserts with some specificity her concerns that plaintiffs' counsel did not do enough to earn the percentage they have requested, as discussed above I conclude that class counsel did engage in litigation efforts that were time consuming and in furtherance of the interests of the class. To the extent she requests heightened scrutiny due to the clear sailing provision, I have engaged in such scrutiny. *See Weinberger* v. *Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 (1st Cir. 1991). Narkin's and Ference's objections are unpersuasive and ungrounded, respectively. Narkin's objection to the fee request states merely that it is excessive, without further explanation. Ference contends that he and other class members are unable to evaluate the fairness of the request for attorneys' fees because the motion is not available on the settlement website. Although the motion does not appear there, the plaintiffs' extensive memorandum in support of the motion and accompanying exhibits are available on the website and on the court's electronic docket. Those submissions provide enough background for a class member to lodge an objection. I accordingly overrule the objections on this point.

awarded to them, with those of Class Counsel, who has undoubtedly worked diligently for [their] clients," I find that 25% of the common fund, which is a substantial discount from the lodestar, represents a reasonable distribution. *See Latorraca*, 834 F. Supp. 2d at 28; *see also New Eng. Carpenters Health Benefits Fund* v. *First Databank, Inc.*, Civ. No. 05-11148, 2009 WL 2408560, at *1-2 (D. Mass. Aug. 3, 2009) (using lodestar to check appropriateness of POF-based fee and determining that an appropriate fee award was a multiplier of 8.3 times lodestar, and about 20 percent of the common fund, consistent with rulings in other cases, rather than a multiplier of 10.05 lodestar as requested by the attorneys); *Arnold*, 2014 WL 1670133, at *6 (approving request for $1.325 million in attorneys' fees, representing 25% of the $5.3 million settlement fund, and $180,000 in expenses, in similar class action settlement involving the same class counsel). The refund provided to class members is meaningful, and the attorneys engaged in these negotiations adequately equipped with a sense of the strengths and weaknesses of pursuing the case at trial.

### B.  *Request for Expenses*

Plaintiffs' counsel also requests reimbursement for actual expenses of $61,674.44 incurred during litigation. *See*

*Fidelity*, 167 F.3d at 736-37.  The listed expenses include,
among other things, costs associated with mediation, legal
research, filing fees, consultation with experts, photocopying,
and travel to hearings, depositions, and meetings.  I find these
expenses reasonable and will allow the request.

### C.  Request for Incentive Awards

Finally, I address the request for incentive awards for the
plaintiffs.  Incentive awards serve to promote class action
settlements by encouraging named plaintiffs to participate
actively in the litigation in exchange for reimbursement for
their pursuits on behalf of the class overall.  *See Celexa*, 2014
WL 4446464, at *9; *Lupron*, 228 F.R.D. at 98.  Class counsel
requests that the court approve a total of $6,500 in incentive
awards for three plaintiffs: $2,500 for Bezdek, $2,500 for
DeFalco, and $1,500 for Safavi.  Two of the objectors challenge
these incentive awards, asserting that the plaintiffs did not
participate substantially in the litigation.  According to their
own declarations and the representations of class counsel, the
three named plaintiffs participated in the investigations
leading up to the filing of their respective complaints,
reviewed these complaints with counsel prior to filing,
discussed the motions to dismiss in their respective cases with

counsel, participated in limited discovery by responding to document requests and preparing for depositions, and communicated with counsel regarding the settlement negotiations.

These awards are equivalent to those approved in *Compact Disc*, 292 F. Supp. 2d at 189, where the named plaintiffs engaged at a similar level in the litigation. There, Judge Hornby recognized that the plaintiffs "put forth some effort in pursuit of the class," and while "the bulk of the time in [the] case was spent by the lawyers," a minimal award was appropriate for their willingness to prosecute the case, help in conferring a benefit upon the class, and responsiveness to discovery efforts. *Id.* (quoting *Lachance v. Harrington*, 965 F. Supp. 630, 652 (E.D. Pa. 1997)).[24] The slightly lesser award for Safavi is appropriate where he is a plaintiff in a separate, similar action in another federal district court, and has engaged in similar activity in that case. *See Arnold*, 2014 WL 1670133, at *6 (granting $1,500

---

[24] I recognize that in *Compact Disc*, the plaintiffs' depositions were taken, and they also responded to interrogatories and document requests. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 188-90 (D. Me. 2003). Here, the plaintiffs responded to document requests and prepared for deposition, but were not actually deposed. I do not think this distinction between the plaintiffs in these cases and in *Compact Disc* warrants a different result.

service award to named plaintiff in related but separate
proceeding).

## VII. CONCLUSION

For the reasons set forth above, I ALLOW the plaintiffs'
motion for final approval of the proposed class action
settlement, ALLOW the plaintiffs' motion for attorneys' fees,
expenses, and service awards, as refined by class counsels'
subsequent revision to the requested expenses, and DENY the
plaintiffs' motion for discovery of objectors.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT